**IN THE UNITED STATES EASTERN DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| THEODORE HAYES and AQEELA FOGLE | : | CIVIL ACTION |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | NO. 15-2617 |
| | : | |
| PHILIP E. HARVEY | : | |
| | : | |
| Defendant. | : | |
| _____ | : | |

**O R D E R**

AND NOW this _____ day of _____, 2015, Plaintiffs' request for Preliminary

Injunction barring Defendant Harvey and/or any other person on his behalf from evicting the

Hayes Family and all household members from 538 B Pine Street is DENIED.

_____
                                    J.

**IN THE UNITED STATES EASTERN DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| THEODORE HAYES and AQEELA FOGLE | : | CIVIL ACTION |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | NO. 15-2617 |
| | : | |
| PHILIP E. HARVEY | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT PHILIP E. HARVEY'S OPPOSITION
TO PLAINTIFF'S MOTION FOR PRELIMINARY OBJECTION**

For the reasons set forth in the accompanying Memorandum of Law, Defendant Philip E.
Harvey (hereinafter, "Defendant") moves this Honorable Court to deny Plaintiffs, Theodore
Hayes and Aqeela Fogle's (hereinafter collectively referred to as "Hayes Family") Preliminary
Injunction and permit Defendant Harvey to move for eviction of Plaintiffs and all household
members as a matter of law.

**INTRODUCTION**

Defendant Philip E. Harvey is the rightful owner of the property located at 538 Pine
Street, Apt. B, Philadelphia, PA (hereinafter "the premises").  Defendant Harvey and Florence
Hayes, deceased mother of Theodore R. Hayes, entered into a one year lease for the premises
commencing on May 11, 2010.  The lease automatically renewed for a one year term thereafter.
(See Exhibit "G" to Plaintiffs' Complaint, a copy of the Lease Agreement).

On February 17, 2015 and May 1, 2015 Defendant Harvey served the Hayes Family with

notices of non-renewal of the lease agreement which was set to expire on April 30, 2015.

The proposed eviction of the Hayes Family is based on Pennsylvania law and the Housing Assistance Contract (HAP Contract) entered into between Defendant Harvey and the local Philadelphia Housing Authority (PHA) which permit the eviction of a tenant upon the termination of the lease.  In the alternative, if this Honorable Courts finds that good cause is required for the eviction of the Hayes family, which is specifically denied by Defendant Harvey, good cause was provided to Hayes Family as grounds for the eviction.

As discussed *infra*, Plaintiffs' Complaint for Preliminary Objection is without legal basis as the Hayes Family has no right to remain in the premises and the proposed eviction of the Hayes Family is legal and just.

## STATEMENT OF FACTS

Defendant Philip Harvey purchased the duplex located at 536-540 Pine Street, Philadelphia, PA on or about August 31, 2010 from Pine Street Associates.  The property consists of three duplex row homes each with a one bedroom unit on the first floor and a four bedroom unit in apartments 538 B and 540 B and a three bedroom unit in apartment 536 B.

Defendant Harvey has no knowledge of either the remote history of the property and/or the prior tenancy of the Hayes Family.  Mr. Harvey purchased the duplex at market rate for $1,215,000 without the use of any federal subsidy and/or federal mortgage.  The premises was purchased free and clear of any impediments, encumbrances, liens and/or restrictions.  More specifically, the deed has no restrictions on the residential rental use of the premises. (See Exhibit "F", the Deed attached to Plaintiffs' Complaint).   Accordingly, it is undisputed that at no time did Defendant Harvey enter into a projected based Section 8 contract with HUD.

On May 11, 2010, Defendant Harvey and Florence Hayes, deceased mother of Theodore

R. Hayes, entered into a year lease for the premises commencing on May 11, 2010.   The lease

automatically renewed for a one year term thereafter. (See Exhibit "G" to Plaintiffs' Complaint, a

copy of the Lease Agreement).

Pursuant to the Lease Agreement (Exhibit G), the lease expired on April 30, 2011.  In

compliance with the law and the Lease Agreement, Defendant Harvey provided the Hayes Family

with the appropriate notice of non-renewal of the Lease Agreement. The Lease Agreement,

which is a binding contract, does not permit the Hayes Family to reside in the premises in

perpetuity.  (Exhibit G).

On the same date of the Lease Agreement, Defendant Harvey entered into a HAP

Contract with the local housing authority, Philadelphia Housing Authority.  (See Exhibit "A",

Housing Assistance Contract (HAP Contract, Parts A - C). The HAP Contract specifically

provides:

> "This form of Housing Assistance Payment Contract (HAP contract) is
> used to provide Section 8 tenant-based assistance under the housing
> choice *voucher program (voucher program)* of the U.S. Department of
> Housing and Urban Development (HUD). *The main regulation for this
> program is 24 Code of Federal Regulation Part 982.*

(Exhibit "A", emphasis added).

Although Defendant admits upon information and belief only that the Hayes Family

receives an Enhanced Voucher, at no time was Defendant Harvey privy to the events which led

the Hayes Family's receipt of the Enhanced Voucher and more importantly, Defendant Harvey

never signed a HAP Contract for the Enhanced Voucher. To the contrary, the HAP Contract

refers specifically to the Section 8 voucher program which is governed by 24 Code of Federal

Regulations and the United States Housing Act of 1937, 42 U.S.C. §1437o and not the Enhanced

Voucher as regulated by the United States Housing Act of 1937, 42 U.S.C. §1437f(t).

On February 17, 2015 and May 1, 2015 Defendant Harvey served the Hayes Family with notices of non-renewal of the lease agreement which was set to expire on April 30, 2015.

There is no legal basis for Plaintiffs' claim that they have a right to remain in the premises.

## LEGAL STANDARDS FOR PRELIMINARY INJUNCTION

In order to prevail on a claim for preliminary injunction a plaintiff must show "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter, et al. v. Natural Resources Defense Council, Inc.*, et al. 129 S. Ct. 365 (2008). With respect to irreparable injury, the Supreme Court reiterated that "plaintiffs seeking preliminary relief [must] demonstrate that irreparable injury is likely in the absence of an injunction." Id at. 366 . Plaintiffs seeking preliminary injunction will have to demonstrate the probability of prevailing on the merits, and the probability of irreparable injury without injunctive relief. A mere possibility of either success on the merits or irreparable injury will not suffice.

## LEGAL ARGUMENT

I.  **Plaintiffs Do Not Have a Likelihood of Success on their Federal Law Claim as 42 U.S.C. §1437f(t) Does Not Apply.**

A.  **Statutory Background**

The Housing Choice Voucher Program (HCV), formerly known as Section 8, is a federally funded program which is administered by the local housing authorities. The program provides subsidized rental assistance to very low-income and disabled families to afford housing in the private market. (See HUD.gov, Housing Choice Voucher Fact Sheet).

HCV may be either "project-based" or "tenant based." 24 C.F.R. §982.1(b)(1). Project based assistance is tied to the individual units where as tenant based assistance is associated with the tenant and moves along with the tenant when he or she moves to another HCV unit. Under the tenant based voucher program HUD enters into a HAP contract with private owners for individual units after the tenant has selected their unit of choice. Tenant based vouchers are portable meaning that the tenant may choose to live in any property where an owner agrees to enter into a HAP contract. 42 U.S.C. §1437f(o)(1)(B), 42 U.S.C. §1437f(o)(2)(A)-(B). A family that is issued a housing voucher is responsible for finding a suitable housing unit of the family's choice where the owner agrees to rent under the program. (See HUD.gov, Housing Choice Voucher Fact Sheet).

Under the voucher program, the contract entered into between the landlord-owner and the local housing authority:

> "shall provide *that during the term[1] of the lease*, the owner shall not terminate the tenancy except for serious repeated violations of the terms and conditions of the lease, for violations of applicable Federal, State or local law, or for other good cause, and in the case of an owner who is an immediate successor in interest pursuant to foreclosure during the term of the lease vacating the property prior to sale shall not constitute other good cause..."

42 U.S.C. 1437o(7)(C), emphasis added.

It is undisputed that Plaintiffs received a tenant based assistance voucher in the case at hand. Although project based assistance is not applicable to the case at hand, Defendant provides the procedural history by way of background only.

In the 1960's, Congress sought to entice landowners to build affordable project based

---

[1] It is implicit that as in all landlord-tenant relationships, the lease terminates upon the termination of the term and that the landlord is entitled to evict pursuant to Pennsylvania and local laws.

rental housing for low-income and disabled tenants by subsidizing and insuring mortgage loans for the construction of multifamily housing.  See Housing & Urban Development Act of 1968, 82 Stat. 476, 498-503 (1968), Pub. L. No. 90-448, §§ 201 (a), 236 (a)-(g).  Under this program, HUD entered into contracts with private homeowners to insure and subsidize the interest payments of the mortgages held by the owners.  In the late 1980's many of these owners became eligible to prepay mortgages, thus terminated their contracts with HUD and opted out of the project based program  24 C.F.R. §221.524 (a)(ii)(197).

In order to protect tenants residing in assisted units when owners sought to "opt out", Congress enacted a notice requirement requiring the owner to provide the tenant and HUD with written notice "not less than one year before the [proposed] termination."  42 U.S.C. §1437f(c)(8)(A).

As numerous project based contracts began to expire in the late 1990's, Congress authorized HUD to issue "enhanced vouchers."  See 113 Stat. 1047, 1113 (1999), Pub. L. No.: 106-74, §531(d)(1). Under the enhanced voucher program, *if __an owner__[2] opts out of the project based contract*, HUD is authorized to issue "enhanced" vouchers to tenants who are residing in the project at the date of the contract expiration.  42 U.S.C. §1437f(t).

On July 13, 2000, Congress amended subsection (t) to provide that the "assisted family *may elect to remain* in the same project" at the time of the contract termination.  114 Stat. 569 (2000), Pub. L. No. 106-246 §2801, emphasis added. In conjunction with the amendment, HUD issued a publication that provided guidance to tenants regarding their rights to remain in their

---

[2] By Plaintiffs' own admission, Defendant Harvey is not the owner who "opted out." Plaintiffs admit, although Defendant has no independent knowledge, that the premises was originally a project based unit and that the prior owner, Pine Street Associates, who received the federally subsidized mortgage opted out in 2008.

homes when landlords decide to exercise their opt-out prerogative. The HUD Policy Guide

provides that ***owners who have decided to opt-out of the project based Section 8 program*** to

certify that they "will comply with the requirements to allow families receiving enhanced

vouchers who elect to remain to do so as long as the property remains a rental property, unless

the owner has just cause for eviction." See Section 8 Renewal Policy Guide ("HUD Policy

Guide") and issued on January 19, 2001, page 5-6 and as amended in February 15, 2008 (See

Exhibit A attached to Plaintiffs' Complaint). The opt out owner his required to certify that they

agree to honor the tenants' right to remain at the property. Id. at pg. 6. "If an owner refuses to

honor the tenants right to remain, the tenant's remedy will depend on State and local law." Id at

pg. 3, Section 11-3 B 1.

> **B.      Defendant Harvey's property located at 536 Pine Street, Apt B is Not A
>          Project Based Unit and Thus the Right to Remain is Not Applicable.**

It is undisputed that:

- at no time did Defendant Harvey enter into a project based Section 8 assistance contract with HUD;

- at no time did Defendant Harvey obtain a subsidized or federally insured mortgage from HUD;

- the Hayes Family's prior landlord who had allegedly entered into a project based Section 8 Contract with HUD was the only landlord owner who was required to issue the one year opt out notice letter and certify that he/she would honor the tenant's right to remain.

- at no time did Defendant Hayes certify to the Hayes Family that he would honor their right to remain. Not only did Defendant Hayes never make such a certification, he was also not required to issue such a certification as he was never subject to a project based Section 8 Contract.

The only evidence submitted by Plaintiffs, the truth of which is neither admitted nor

denied by Defendant Harvey as Defendant has no knowledge of the remote history of the

property, is that the previous owner utilized federal project-based section 8 subsidies to build the property in approximately 1982. Plaintiffs allege that "[i]n 2008 the [previous] owner of Washington Square East opted out of renewing the project-based Section 8 contract..."

There simply is no evidence and/or law relied upon by Plaintiffs, as none exists, to support Plaintiffs allegation that a new owner of the premises who NEVER entered into any projected based Section 8 contract with HUD nor utilized ANY federal funds to purchase the property is bound by the Enhanced Voucher regulations. By Plaintiffs own admission the "*United States Housing Act protects low-income tenants whose property owners chose to prepay or opt out.*" (emphasis added). In the case at hand, Defendant Harvey never accepted federal funding to purchase the property and as such was not required to issue the requisite one year opt out letter to the Hayes Family. 42 U.S.C. §1437(c)(8)(A).

Although Defendant Harvey admits upon information and belief that Plaintiffs are receiving an enhanced voucher, at no time did Defendant Harvey enter into an enhanced voucher contract with the local housing authority. The only contract entered into by Defendant Harvey is the HAP Contract with the local housing authority, PHA. The HAP Contract provides:

> "This form of Housing Assistance Payment Contract (HAP contract) is used to provide Section 8 tenant-based assistance under the housing choice *voucher program (voucher program)* of the U.S. Department of Housing and Urban Development (HUD). *The main regulation for this program is 24 Code of Federal Regulation Part 982.*

(Exhibit "A", emphasis added).

The HAP Contract (Exhibit "A") specifically provides that the tenant is receiving Section 8 tenant based assistance under the *voucher program*, not the enhanced voucher program. The contract specifically states that the program is regulated pursuant to 24 Code of Federal Regulation Part 982 which governs a regular voucher, not an enhanced voucher which is

regulated by 42 U.S.C. §1437f(t).  Of greater significance is that no where in the contract entered

into between Defendant Harvey and the local housing authority does it mention that the Hayes

Family has a right to remain in the unit.  To the contrary, the contract specifically provides:

> "4.    **Term of HAP Contract**
>
>> a.    Relation to lease term.  The term of the HAP contract begins
>> on the first day of the initial term of the lease, ***and terminates on
>> the last day of the term of the lease*** (including the initial lease
>> term and any extensions)."

(See Exhibit "A", HAP Contract, Part B, Section 4a, pg. 3 of 10).

Moreover, Part C of the HAP Contract: Tenancy Addendum, states:

> "1.    **Section 8 Voucher Program**
>
>> a.    The owner is leasing the contract unit to the tenant for
>> occupancy by the tenant's family with assistance for a
>> tenancy under the Section 8 housing choice voucher
>> program (voucher program) of the United States
>> Department of Housing and Urban Development (HUD).

(See Exhibit "A", HAP Contract, Part C, Section 1a, pg. 8 of 10).

> "3.    **Use of Contract Unit**
>
>> a.    *During the lease term*, the family will reside in the contract
>> unit with assistance under the voucher program."

(See Exhibit "A", HAP Contract, Part C, Section 3a, pg. 8 of 10).

> "8.    **Termination of Tenancy by Owner**
>
>> a.    Requirements: The owner may only ***terminate the tenancy***
>> in accordance with the lease and HUD requirements.
>
>> b.    Grounds. ***During the term of the lease (the initial term of the
>> lease or any extension term)***, the owner may only terminate the
>> tenancy because of:
>
>>> (1) Serious or repeated violations of the lease;
>>> (2) Violation of Federal, State or local law that imposes obligations

on the tenant in connection with the occupancy or use of the unit
and the premises;

(3) Criminal activity or alcohol abuse;

(4) Other good cause (as provided in paragraph d).

(See Exhibit "A", HAP Contract, Part C, Section 8a-b, pg. 9 of 10).

Per the Lease Agreement, the initial term of the lease began on May 11, 2010 and ended

on April 30, 2011 with automatic annual renewals until notice of termination is provided by

either the landlord or tenant. (See Lease Agreement, Exhibit "G" to Plaintiffs' Complaint). In

both February and May, 2015 Defendant Harvey sent notices to the Hayes Family of his intention

to not renew the lease which was set to expire on April 30, 2015. Pursuant to Pennsylvania and

local laws, the termination of the term of the lease is a valid legal basis for evicting a tenant. See,

Landlord Tenant Act of 1951. Moreover, the binding contract entered into between the Hayes

Family, Defendant Harvey and the Philadelphia Housing Authority authorizes the termination of

the lease upon the termination of the term.

Although the Lease Agreement (Exhibit G) and HAP Contract provide a section for

termination of the tenancy by the owner during the term of the lease, such sections are not

applicable given that the term of the lease had expired on April 30, 2015. (See, Exhibit "G",

Lease Agreement, Section 9 Breaking the Lease and Exhibit "A" HAP Contract). Plaintiffs are

violating the lease agreement and Pennsylvania Law by continuing to reside in the unit despite

receiving the requisite notice to vacate the unit.

Plaintiffs Memorandum of Law purports to claim that "multiple federal courts

have...granted preliminary and permanent injunctions protecting assisted tenants' Right to

Remain." However all the cases cited by Plaintiffs have no bearing on the case at hand and are

entirely distinguishable from the facts of this case. In all the cases cited by Plaintiffs, *Park*

*Village Apts. et al. v. Mortimer Howard Trust*, 2007 U.S. Dist. LEXIS 14516, *Feemster v. BSA Ltd*, 548 F. 3d 1063 (D.C. Cir. 2008), *aff'g in relevant part*, 471 F. Supp, 2d 87 (D.D.C. 2007); *Barrientos v. 1801-1825 Morton, LLC*, No.: 06-6437, 2007 WL 7213974 (C.D. Cal. Sept. 11, 2007, *aff'd on other grounds*, 583 F.3d 1197 (9th Cir. 2009; *Estevez v. Cosmopolitan Assoc., LLC*, No.: 05-4318, 2005 WL 3164146 (E.D.N.Y Nov. 28, 2005): *Jeanty v. Shore Terrace Realty Ass'n*, No. 03-8669, 2004 WL 1794496 (S.D.N.Y. Aug. 10, 2004), the landlord-defendants had all received federal assistance through the project based Section 8 Program and all had opted out of the program.

As noted supra, Defendant Harvey never purchased a project based property[3] and certainly never received any federal subsidy to purchase the home at market rate for $1,215,000. There is no case law cited by Plaintiffs, and none exists, to support their proposition that an owner such as Defendant Harvey who purchased the property with no deed restrictions, no federal subsidy, no federal insurance, no federal mortgage, and no project based Section 8 Contract is required to permit the Hayes Family to reside in the unit in perpetuity.

Notwithstanding that Defendant Harvey never entered into a project based Section 8 Contract with HUD, the First Circuit Court of Appeals has held that "there is no statutory authorization which would require the Owners to continue participating in HAP contracts once they expired. See, *In People to End Homelessness, Inc. v. Develco Singles Apartment Associates*, 339 F. 3d 1 (1st Cir. 2003) in which the project based HAP contract was set to expire and the owner sent a non-renewal notice to each tenant. HUD then issued the tenants who chose to remain enhanced vouchers. Plaintiffs filed suit in the District Court seeking to enjoin

---

[3] Plaintiffs admit that the previous owner had opted out of the project based Section 8 Contract in 2008.

defendant from evicting them stating failure of the opt out letter to comply with the law.  The court granted the restraining order prohibiting the owners from evicting the tenants for one year or until they received the appropriate notice letter.  However, it also granted defendant-owner's motion for summary judgment finding that 42 U.S.C. §1437 f(t) only obligated HUD to provide a voucher and that the landlord was estopped from evicting only during the one year notice period.

The First Circuit found that §1437 f(t) concerned only HUD's obligation to not force "enhanced voucher tenants" to leave their residence upon the expiration of the project based contract.  Id at. 4. Per the statute, the tenants "may elect to remain," and if they do make such election, HUD must issue them an enhanced voucher so as to permit the tenant to pay the higher rent that may now be charged by the landlord-owner.

Under the 2000 amendment to ¶1437 f(t), Congress clarified that HUD may not avoid its obligation to issue an enhanced voucher by insisting that the tenant leave his or her unit when an "eligibility event" such as the expiration of the project-based contract occurs. 114 Stat. 569 (2000), Pub. L. No. 106-246 §2801.  The Section 8 Renewal Policy further clarifies that the assisted families have "the right to remain in their units as long as the units are offered for rental housing when issued an enhanced voucher.." Clearly the purpose of the "may elect to remain" language regards HUD's obligation to issue the enhanced voucher and pay the higher rent if the tenant chooses to remain, not that the family has the right to remain indefinately.

### C.   Good Cause, Which is Not Required in The Case At Hand, Exists for the Eviction of the Hayes Family

Plaintiffs claim that good cause is required fails for a number of reasons.

1).  Good cause is only required when the owner is seeking to terminate the

tenancy[4]. In the case at hand, the tenancy automatically expired at the end of the term and as such Pennsylvania and local laws permit the eviction; and

    2). As noted above, the right to remain is only applicable at the time the project based owner opts out and provides the tenant the right to remain. It is only at this time that good cause is required to terminate the tenancy.

  Assuming arguendo that Defendant Harvey is bound by the regulations of the enhanced voucher, which is specifically denied for reasons stated supra, it is averred that Defendant Harvey provided the Hayes Family good cause[5] for the eviction.

  24 C.F.R. §982.310 (d)(1), Owner Termination of Tenancy, provides that "good cause for termination of tenancy by owner may include, but is not limited to, any of the following examples:

   (i)  Failure by the family to accept the offer of a new lease or revision;

   (ii)  Family history of disturbances or destruction of property...;

   (iii)  The owner's desire to use the unit for person or family use, or for a purpose other than as a residential rental unit; or

   (iv)  A business or economic reason for termination of the tenancy (such as sale of the property, renovation of the unit, or desire to lease the unit at a higher rental).

  Defendant Harvey informed the Hayes Family of his desire to use the unit for family use. The use of the unit for family use is sufficient good cause pursuant to the Section 8 regulations. Plaintiffs argument that Defendant's desire to move in a family member is suspect is without

---

  [4] By definition tenancy is a holding, as of lands, by any kind of title; occupancy of land, a house, or the like, under a lease.

  [5] The cases provided by plaintiffs which purport to establish what the court have considered to be good cause are likewise not applicable in the case at hand given that the defendant-owners in all of the cases cited by plaintiffs were recipients of federal subsidies.

basis.  Of the two four bedroom units located in this duplex, 538B is the only unit the meets that needs of Defendant's family.  In addition, 540B has a prospective tenant.

### D.   The Granting of Plaintiffs' Preliminary Injunction is a Violation of the Fifth and Tenth Amendment of the Constitution

Plaintiffs' claim that even though no federal subsidy contract ever existed between Defendant and HUD and that Defendant Harvey never reaped the benefits of any subsidized mortgage, 42 U.S.C. §1437 f(t) grants them the right to remain in their rental unit in perpetuity. Such an interpretation essentially transfers the property rights of a landlord to the tenant without just compensation and in violation of the Fifth and Tenth Amendments of the U.S. Constitution.

### 1.   Violation of Fifth Amendment

The Fifth Amendment limits the federal government's power of eminent domain: "nor shall private property be taken for public use without just compensation." U.S. Const., amend. V. They Hayes Family's interpretation of the law results in a regulatory taking of personal property in violation of the Fifth Amendment of the U.S. Constitution which provides that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V.  The "use of a restriction on real property may constitute a taking if not reasonably necessary to the effectuation of a substantial public purpose [citations omitted], or perhaps if it has an unduly harsh impact upon the owner's use of the property." *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 127 (1978).

The "right to remain" restricts the use of private real property especially in the case at hand when Defendant Harvey never entered into a project based contract agreeing to restrict his property.  To the contrary, he purchased his property with no deed restrictions and only entered into a tenant based contract with HUD which expired at the end of the term of the lease.

Moreover, the taking resulting from the right to remain does not effectuate a substantial public benefit. Instead it unduly and harshly impacts the Defendant's use of the property. It cannot be said that a taking for the benefit of an enhanced voucher holders is a public benefit especially where the statute specifically identifies the limited private individuals who are being granted the alleged "right to remain."

Plaintiffs claim that they have an indefinite right to remain is a per se taking for Fifth Amendment purposes in that the government is requiring Defendant Harvey to suffer a permanent invasion of his personal property. This "permanent residency" is far more invasive than the running of cable lines through a personal property which our courts have found to be a taking under the Fifth Amendment. *Lingle v. Chevron U.S.A., Inc.* 544 U.S. 528, 538 (2005) (*citing Loretto v. Teleprompter Manhattan CATV Corp.*, 558 U.S. 419 (1982) in which the Court held that a state law requiring owners to permit cable companies to install cable facilities in apartment buildings was a taking.

"It has long been accepted that the sovereign may not take the property of *A* for the sole purpose of transferring it to another private party *B*, even though *A* is paid just compensation." *Kelo v. City of New London, Connecticut*, 545 U.S. 469, 477 (2005).

### 2.    Violation of Tenth Amendment

The Tenth Amendment provides, "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectfully, or to the people." U.S. Const., amend. X.  Under the Tenth Amendment, the Court must determine whether an act of state sovereignty is protected by a limitation on an Article I power. *New York v. U.S.*, 505 U.S. 144, 157 (1992).

It has long been the law that the "disposition of immovable property, whether by deed,

descent, or any other mode, is exclusively subject to the government in whose jurisdiction the property is situated." *U.S. v. Fox*, 94 U.S. 315, 320 (1877). Plaintiffs claim that they are entitled to remain essentially grants them a property interest in the Defendant's privately owned property in violation of the Tenth Amendment.

Accordingly, for all the reasons stated above Plaintiffs have failed to show a likelihood of success on their federal law claim.

## II.      Plaintiffs Will Not Suffer Irreparable Harm if They are Evicted

Plaintiff Hayes Family has reaped the benefits of living in Society Hill since 1982. It is not uncommon for families, of any economic means, to move from their long lived place of residence for numerous reasons: divorce, job relocation, foreclosure, termination of lease by private landlord, inability to afford increased rent in the private market, etc.

The Hayes Family's connection to this area can continue as nothing prevents them being members of their church, and the children will most likely remain members of the same school given the Philadelphia School District's policy of busing children from distant places.

Moreover, the family will continue to receive a federal subsidy for another rental unit of their choosing.

Accordingly, Plaintiffs have failed to show that they will suffer irreparable harm if evicted.

## III.     Granting the Relief will Result in Even Greater Harm to Defendant

For all the reasons stated above, including violations of Defendant Harvey's Constitutional Rights, the harm to Defendant Harvey is significantly greater than the harm to Plaintiffs.

**IV.     There is No Public Interest in Granting Plaintiff's Requested Relief**

Plaintiffs admit in this first paragraph that "federal courts... have upheld the Right to Remain for low income families who face the termination of their project based subsidy by providing them with Enhanced Vouchers." At no point did Defendant Harvey ever enter into a project based contract with HUD, accordingly by plaintiff's own admission, the right to remain is not applicable to this case.

For the reasons provided above, there is no public interest in granting plaintiffs' request for relief.

**CONCLUSION**

For the foregoing reasons, Plaintiffs' request for Preliminary Injunction barring Defendant Harvey and/or any other person on his behalf from evicting the Hayes Family and all household members from 538 B Pine Street be denied.

Respectfully submitted,

KOLBER & RANDAZZO, P.C.

BY: _____
Susanna Randazzo, Esquire
I.D. No. 79116
1 South Broad Street
Suite 1610
Philadelphia, PA 19107
P - (215) 567-1333
F - (215) 567-2099

Dated: June 19, 2015

# EXHIBIT A

**Housing Assistance Payments Contract
(HAP Contract)
Section 8 Tenant-Based Assistance
Housing Choice Voucher Program**

U.S. Department of Housing
and Urban Development
Office of Public and Indian Housing

---

Part A of the HAP Contract: Contract Information

(To prepare the contract, fill out all contract information in Part A.)

1. **Contents of Contract**
   This HAP contract has three parts:
   Part A: Contract Information
   Part B: Body of Contract
   Part C: Tenancy Addendum

2. **Tenant**
   Florence Hayes

3. **Contract Unit**
   538 Pine Street
   Suite B
   Philadelphia, PA  19106

4. **Household**

   The following persons may reside in the unit.  Other persons may not be added to the household without prior written approval of the owner and the PHA.

   Florence Hayes

   Aqeela Fogle

   Dhameer E Frazier

   James J Way

   Raanee A Smith

   Theodore R Hayes

5. **Initial Lease Term**
   The initial lease term begins on (mm/dd/yyyy):  05/11/2010
   The initial lease term ends on (mm/dd/yyyy):  04/30/2011

6. **Initial Rent to Owner**
   The initial rent to owner is: $ 2,400.00
   During the initial lease term, the owner may not raise the rent to owner.

7. **Initial Housing Assistance Payment**

   The HAP contract term commences on the first day of the initial lease term.  At the beginning of the HAP contract term, the amount of the housing assistance payment by the PHA to the owner is $ ~~607.00~~  1623.00  per month.
   The amount of the monthly housing assistance payment by the PHA to the owner is subject to change during the HAP contract term in accordance with HUD requirements.

---

Previous editions are obsolete

form **HUD-52641** (8/2009)
ref Handbook 7420.8

**Housing Assistance Payments Contract**

**(HAP Contract)**

**Section 8 Tenant-Based Assistance**
**Housing Choice Voucher Program**

**U.S. Department of Housing**
**and Urban Development**
Office of Public and Indian Housing

OMB Approval No. 2577- 0169
(Exp. 09/30/2012)

---

**Instructions for use of HAP Contract**

This form of Housing Assistance Payments Contract (HAP contract) is used to provide Section 8 tenant-based assistance under the housing choice voucher program (voucher program) of the U.S. Department of Housing and Urban Development (HUD). The main regulation for this program is 24 Code of Federal Regulations Part 982.

The local voucher program is administered by a public housing agency (PHA). The HAP contract is an agreement between the PHA and the owner of a unit occupied by an assisted family. The HAP contract has three parts:

Part A Contract information (fill-ins).
See section by section instructions.
Part B Body of contract
Part C Tenancy addendum

**Use of this form**

Use of this HAP contract is required by HUD. Modification of the HAP contract is not permitted. The HAP contract must be word-for-word in the form prescribed by HUD.
However, the PHA may choose to add the following:

> Language that prohibits the owner from collecting a security deposit in excess of private market practice, or in excess of amounts charged by the owner to unassisted tenants. Such a prohibition must be added to Part A of the HAP contract.

> Language that defines when the housing assistance payment by the PHA is deemed received by the owner (e.g., upon mailing by the PHA or actual receipt by the owner). Such language must be added to Part A of the HAP contract.

To prepare the HAP contract, fill in all contract information in Part A of the contract. Part A must then be executed by the owner and the PHA.

**Use for special housing types**

In addition to use for the basic Section 8 voucher program, this form must also be used for the following "special housing types" which are voucher program variants for special needs (see 24 CFR Part 982, Subpart M): (1) single room occupancy (SRO) housing; (2) congregate housing; (3) group home; (4) shared housing; and (5) manufactured home rental by a family that leases the manufactured home and space. When this form is used for a special housing type, the special housing type shall be specified in Part A of the HAP contract, as follows: "This HAP contract is used for the following special housing type under HUD regulations for the Section 8 voucher program: (Insert Name of Special Housing type)."

However, this form may not be used for the following special housing types: (1) manufactured home space rental by a family that owns the manufactured home and leases only the space; (2) cooperative housing; and (3) the homeownership option under Section 8(y) of the United States Housing Act of 1937 (42 U.S.C. 1437f(y)).

**How to fill in Part A**
Section by Section Instructions

Section 2: **Tenant**
Enter full name of tenant.

Section 3. **Contract Unit**
Enter address of unit, including apartment number, if any.

Section 4. **Household Members**
Enter full names of all PHA-approved household members. Specify if any such person is a live-in aide, which is a person approved by the PHA to reside in the unit to provide supportive services for a family member who is a person with disabilities.

Section 5. **Initial Lease Term**
Enter first date and last date of initial lease term.

The initial lease term must be for at least one year. However, the PHA may approve a shorter initial lease term if the PHA determines that:

- Such shorter term would improve housing opportunities for the tenant, **and**

- Such shorter term is the prevailing local market practice.

Section 6. **Initial Rent to Owner**
Enter the amount of the monthly rent to owner during the initial lease term. The PHA must determine that the rent to owner is reasonable in comparison to rent for other comparable unassisted units. During the initial lease term, the owner may not raise the rent to owner.

Section 7. **Housing Assistance Payment**
Enter the initial amount of the monthly housing assistance payment.

Section 8. **Utilities and Appliances.**
The lease and the HAP contract must specify what utilities and appliances are to be supplied by the owner, and what utilities and appliances are to be supplied by the tenant. Fill in section 8 to show who is responsible to provide or pay for utilities and appliances.

---

Housing Assistance Payments Contract
(HAP) Contract
Section 8 Tenant-Based Assistance
Housing Choice Voucher Program

U.S. Department of Housing
and Urban Development
Office of Public and Indian Housing

---

## Part B of HAP Contract:  Body of Contract

1. Purpose

   a.  This is a HAP contract between the PHA and the owner.
       The HAP contract is entered to provide assistance for the
       family under the Section 8 voucher program (see HUD
       program regulations at 24 Code of Federal Regulations
       Part 982).

   b.  The HAP contract only applies to the household and
       contract unit specified in Part A of the HAP contract.

   c.  During the HAP contract term, the PHA will pay housing
       assistance payments to the owner in accordance with the
       HAP contract.

   d.  The family will reside in the contract unit with assistance
       under the Section 8 voucher program. The housing assis-
       tance payments by the PHA assist the tenant to lease the
       contract unit from the owner for occupancy by the family.

2. Lease of Contract Unit

   a.  The owner has leased the contract unit to the tenant for
       occupancy by the family with assistance under the Sec-
       tion 8 voucher program.

   b.  The PHA has approved leasing of the unit in accordance
       with requirements of the Section 8 voucher program.

   c.  The lease for the contract unit must include word-for-
       word all provisions of the tenancy addendum required by
       HUD (Part C of the HAP contract).

   d.  The owner certifies that:

       (1)  The owner and the tenant have entered into a lease of
            the contract unit that includes all provisions of the
            tenancy addendum.

       (2)  The lease is in a standard form that is used in the
            locality by the owner and that is generally used for
            other unassisted tenants in the premises.

       (3)  The lease is consistent with State and local law.

   e.  The owner is responsible for screening  the family's
       behavior or suitability for tenancy.  The PHA is not
       responsible for such screening. The PHA has no liability
       or responsibility to the owner or other persons for the
       family's behavior or the family's conduct in tenancy.

3. Maintenance, Utilities, and Other Services

   a.  The owner must maintain the contract unit and premises
       in accordance with the housing quality standards (HQS).

   b.  The owner must provide all utilities needed to comply
       with the HQS.

   c.  If the owner does not maintain the contract unit in
       accordance with the HQS, or fails to provide all utilities
       needed to comply with the HQS,  the PHA may exercise
       any available remedies. PHA remedies for such breach
       include recovery of overpayments, suspension of hous-

       ing assistance payments, abatement or other reduction of
       housing assistance payments, termination of housing
       assistance payments, and termination of the HAP con-
       tract.  The PHA may not exercise such remedies against
       the owner because of an HQS breach for which the
       family is responsible, and that is not caused by the
       owner.

   d.  The PHA shall not make any housing assistance pay-
       ments if the contract unit does not meet the HQS, unless
       the owner corrects the defect within the period specified
       by the PHA and the PHA verifies the correction.  If a
       defect is life threatening, the owner must correct the
       defect within no more than 24 hours.  For other defects,
       the owner must correct the defect within the period
       specified by the PHA.

   e.  The PHA may inspect the contract unit and premises at
       such times as the PHA determines necessary, to ensure
       that the unit is in accordance with the HQS.

   f.  The PHA must notify the owner of any HQS defects
       shown by the inspection.

   g.  The owner must provide all housing services as agreed to
       in the lease.

4. Term of HAP Contract

   a.  Relation to lease term.  The term of the HAP contract
       begins on the first day of the initial term of the lease, and
       terminates on the last day of the term of the lease
       (including the initial lease term and any extensions).

   b.  When HAP contract terminates.

       (1)  The HAP contract terminates automatically if the
            lease is terminated by the owner or the tenant.

       (2)  The PHA may terminate program assistance for the
            family for any grounds authorized in accordance
            with HUD requirements.  If the PHA terminates
            program assistance for the family, the HAP contract
            terminates automatically.

       (3)  If the family moves from the contract unit, the HAP
            contract terminates automatically.

       (4)  The HAP contract terminates automatically 180 cal-
            endar days after the last housing assistance payment
            to the owner.

       (5)  The PHA may terminate the HAP contract if the
            PHA determines, in accordance with HUD require-
            ments, that available program funding is not suffi-
            cient to support continued assistance for families in
            the program.

---

Page 3 of 10

    (6) The PHA may terminate the HAP contract if the PHA determines that the contract unit does not provide adequate space in accordance with the HQS because of an increase in family size or a change in family composition.

    (7) If the family breaks up, the PHA may terminate the HAP contract, or may continue housing assistance payments on behalf of family members who remain in the contract unit.

    (8) The PHA may terminate the HAP contract if the PHA determines that the unit does not meet all requirements of the HQS, or determines that the owner has otherwise breached the HAP contract.

5.  Provision and Payment for Utilities and Appliances

  a.  The lease must specify what utilities are to be provided or paid by the owner or the tenant.

  b.  The lease must specify what appliances are to be provided or paid by the owner or the tenant.

  c.  Part A of the HAP contract specifies what utilities and appliances are to be provided or paid by the owner or the tenant. The lease shall be consistent with the HAP contract.

6.  Rent to Owner: Reasonable Rent

  a.  During the HAP contract term, the rent to owner may at no time exceed the reasonable rent for the contract unit as most recently determined or redetermined by the PHA in accordance with HUD requirements.

  b.  The PHA must determine whether the rent to owner is reasonable in comparison to rent for other comparable unassisted units. To make this determination, the PHA must consider:

    (1) The location, quality, size, unit type, and age of the contract unit; and

    (2) Any amenities, housing services, maintenance and utilities provided and paid by the owner.

  c.  The PHA must redetermine the reasonable rent when required in accordance with HUD requirements. The PHA may redetermine the reasonable rent at any time.

  d.  During the HAP contract term, the rent to owner may not exceed rent charged by the owner for comparable unassisted units in the premises. The owner must give the PHA any information requested by the PHA on rents charged by the owner for other units in the premises or elsewhere.

7.  PHA Payment to Owner

  a.  When paid

    (1) During the term of the HAP contract, the PHA must make monthly housing assistance payments to the owner on behalf of the family at the beginning of each month.

    (2) The PHA must pay housing assistance payments promptly when due to the owner.

    (3) If housing assistance payments are not paid promptly when due after the first two calendar months of the HAP contract term , the PHA shall pay the owner

penalties in accordance with generally accepted practices and law, as applicable in the local housing market, governing penalties for late payment by a tenant. However, the PHA shall not be obligated to pay any late payment penalty if HUD determines that late payment by the PHA is due to factors beyond the PHA's control. Moreover, the PHA shall not be obligated to pay any late payment penalty if housing assistance payments by the PHA are delayed or denied as a remedy for owner breach of the HAP contract (including any of the following PHA remedies: recovery of overpayments, suspension of housing assistance payments, abatement or reduction of housing assistance payments, termination of housing assistance payments and termination of the contract).

    (4) Housing assistance payments shall only be paid to the owner while the family is residing in the contract unit during the term of the HAP contract. The PHA shall not pay a housing assistance payment to the owner for any month after the month when the family moves out.

  b.  Owner compliance with HAP contract. Unless the owner has complied with all provisions of the HAP contract, the owner does not have a right to receive housing assistance payments under the HAP contract.

  c.  Amount of PHA payment to owner

    (1) The amount of the monthly PHA housing assistance payment to the owner shall be determined by the PHA in accordance with HUD requirements for a tenancy under the voucher program.

    (2) The amount of the PHA housing assistance payment is subject to change during the HAP contract term in accordance with HUD requirements. The PHA must notify the family and the owner of any changes in the amount of the housing assistance payment.

    (3) The housing assistance payment for the first month of the HAP contract term shall be pro-rated for a partial month.

  d.  Application of payment. The monthly housing assistance payment shall be credited against the monthly rent to owner for the contract unit.

  e.  Limit of PHA responsibility.

    (1) The PHA is only responsible for making housing assistance payments to the owner in accordance with the HAP contract and HUD requirements for a tenancy under the voucher program.

    (2) The PHA shall not pay any portion of the rent to owner in excess of the housing assistance payment. The PHA shall not pay any other claim by the owner against the family.

  f.  Overpayment to owner. If the PHA determines that the owner is not entitled to the housing assistance payment or any part of it, the PHA, in addition to other remedies, may deduct the amount of the overpayment from any amounts due the owner (including amounts due under any other Section 8 assistance contract).

Owner Certification

During the term of this contract, the owner certifies that:

   a. The owner is maintaining the contract unit and premises in accordance with the HQS.

   b. The contract unit is leased to the tenant. The lease includes the tenancy addendum (Part C of the HAP contract), and is in accordance with the HAP contract and program requirements. The owner has provided the lease to the PHA, including any revisions of the lease.

   c. The rent to owner does not exceed rents charged by the owner for rental of comparable unassisted units in the premises.

   d. Except for the rent to owner, the owner has not received and will not receive any payments or other consideration (from the family, the PHA, HUD, or any other public or private source) for rental of the contract unit during the HAP contract term.

   e. The family does not own or have any interest in the contract unit.

   f. To the best of the owner's knowledge, the members of the family reside in the contract unit, and the unit is the family's only residence.

   g. The owner (including a principal or other interested party) is not the parent, child, grandparent, grandchild, sister, or brother of any member of the family, unless the PHA has determined (and has notified the owner and the family of such determination) that approving rental of the unit, notwithstanding such relationship, would provide reasonable accommodation for a family member who is a person with disabilities.

9. Prohibition of Discrimination. In accordance with applicable equal opportunity statutes, Executive Orders, and regulations:

   a. The owner must not discriminate against any person because of race, color, religion, sex, national origin, age, familial status, or disability in connection with the HAP contract.

   b. The owner must cooperate with the PHA and HUD in conducting equal opportunity compliance reviews and complaint investigations in connection with the HAP contract.

10. Owner's Breach of HAP Contract

   a. Any of the following actions by the owner (including a principal or other interested party) is a breach of the HAP contract by the owner:

      (1) If the owner has violated any obligation under the HAP contract, including the owner's obligation to maintain the unit in accordance with the HQS.

      (2) If the owner has violated any obligation under any other housing assistance payments contract under Section 8.

      (3) If the owner has committed fraud, bribery or any other corrupt or criminal act in connection with any Federal housing assistance program.

      (4) For projects with mortgages insured by HUD or loans made by HUD, if the owner has failed to comply with the regulations for the applicable mortgage insurance or loan program, with the mortgage or mortgage note, or with the regulatory agreement; or if the owner has committed fraud, bribery or any other corrupt or criminal act in connection with the mortgage or loan.

      (5) If the owner has engaged in any drug-related criminal activity or any violent criminal activity.

   b. If the PHA determines that a breach has occurred, the PHA may exercise any of its rights and remedies under the HAP contract, or any other available rights and remedies for such breach. The PHA shall notify the owner of such determination, including a brief statement of the reasons for the determination. The notice by the PHA to the owner may require the owner to take corrective action, as verified or determined by the PHA, by a deadline prescribed in the notice.

   c. The PHA's rights and remedies for owner breach of the HAP contract include recovery of overpayments, suspension of housing assistance payments, abatement or other reduction of housing assistance payments, termination of housing assistance payments, and termination of the HAP contract.

   d. The PHA may seek and obtain additional relief by judicial order or action, including specific performance, other injunctive relief or order for damages.

   e. Even if the family continues to live in the contract unit, the PHA may exercise any rights and remedies for owner breach of the HAP contract.

   f. The PHA's exercise or non-exercise of any right or remedy for owner breach of the HAP contract is not a waiver of the right to exercise that or any other right or remedy at any time.

11. PHA and HUD Access to Premises and Owner's Records

   a. The owner must provide any information pertinent to the HAP contract that the PHA or HUD may reasonably require.

   b. The PHA, HUD and the Comptroller General of the United States shall have full and free access to the contract unit and the premises, and to all accounts and other records of the owner that are relevant to the HAP contract, including the right to examine or audit the records and to make copies.

   c. The owner must grant such access to computerized or other electronic records, and to any computers, equipment or facilities containing such records, and must provide any information or assistance needed to access the records.

12. Exclusion of Third Party Rights

   a. The family is not a party to or third party beneficiary of Part B of the HAP contract. The family may not enforce any provision of Part B, and may not exercise any right or remedy against the owner or PHA under Part B.

b. The tenant or the PHA may enforce the tenancy addendum (Part C of the HAP contract) against the owner, and may exercise any right or remedy against the owner under the tenancy addendum.

c. The PHA does not assume any responsibility for injury to, or any liability to, any person injured as a result of the owner's action or failure to act in connection with management of the contract unit or the premises or with implementation of the HAP contract, or as a result of any other action or failure to act by the owner.

d. The owner is not the agent of the PHA, and the HAP contract does not create or affect any relationship between the PHA and any lender to the owner or any suppliers, employees, contractors or subcontractors used by the owner in connection with management of the contract unit or the premises or with implementation of the HAP contract.

## 13. Conflict of Interest

a. "Covered individual" means a person or entity who is a member of any of the following classes:

(1) Any present or former member or officer of the PHA (except a PHA commissioner who is a participant in the program);

(2) Any employee of the PHA, or any contractor, subcontractor or agent of the PHA, who formulates policy or who influences decisions with respect to the program;

(3) Any public official, member of a governing body, or State or local legislator, who exercises functions or responsibilities with respect to the program; or

(4) Any member of the Congress of the United States.

b. A covered individual may not have any direct or indirect interest in the HAP contract or in any benefits or payments under the contract (including the interest of an immediate family member of such covered individual) while such person is a covered individual or during one year thereafter.

c. "Immediate family member" means the spouse, parent (including a stepparent), child (including a stepchild), grandparent, grandchild, sister or brother (including a stepsister or stepbrother) of any covered individual.

d. The owner certifies and is responsible for assuring that no person or entity has or will have a prohibited interest, at execution of the HAP contract, or at any time during the HAP contract term.

e. If a prohibited interest occurs, the owner shall promptly and fully disclose such interest to the PHA and HUD.

f. The conflict of interest prohibition under this section may be waived by the HUD field office for good cause.

g. No member of or delegate to the Congress of the United States or resident commissioner shall be admitted to any share or part of the HAP contract or to any benefits which may arise from it.

## 14. Assignment of the HAP Contract

a. The owner may not assign the HAP contract to a new owner without the prior written consent of the PHA.

b. If the owner requests PHA consent to assign the HAP contract to a new owner, the owner shall supply any information as required by the PHA pertinent to the proposed assignment.

c. The HAP contract may not be assigned to a new owner that is debarred, suspended or subject to a limited denial of participation under HUD regulations (see 24 Code of Federal Regulations Part 24).

d. The HAP contract may not be assigned to a new owner if HUD has prohibited such assignment because:

(1) The Federal government has instituted an administrative or judicial action against the owner or proposed new owner for violation of the Fair Housing Act or other Federal equal opportunity requirements, and such action is pending; or

(2) A court or administrative agency has determined that the owner or proposed new owner violated the Fair Housing Act or other Federal equal opportunity requirements.

e. The HAP contract may not be assigned to a new owner if the new owner (including a principal or other interested party) is the parent, child, grandparent, grandchild, sister or brother of any member of the family, unless the PHA has determined (and has notified the family of such determination) that approving the assignment, notwithstanding such relationship, would provide reasonable accommodation for a family member who is a person with disabilities.

f. The PHA may deny approval to assign the HAP contract if the owner or proposed new owner (including a principal or other interested party):

(1) Has violated obligations under a housing assistance payments contract under Section 8;

(2) Has committed fraud, bribery or any other corrupt o criminal act in connection with any Federal housin, program;

(3) Has engaged in any drug-related criminal activity o any violent criminal activity;

(4) Has a history or practice of non-compliance with th HQS for units leased under the Section 8 tenan based programs, or non-compliance with applicab housing standards for units leased with project based Section 8 assistance or for units leased und any other Federal housing program;

(5) Has a history or practice of failing to termina tenancy of tenants assisted under any Federally a sisted housing program for activity engaged in the tenant, any member of the household, a guest another person under the control of any member the household that:

(a) Threatens the right to peaceful enjoyment of premises by other residents;

(b) Threatens the health or safety of other residents, of employees of the PHA, or of owner employees or other persons engaged in management of the housing;

(c) Threatens the health or safety of, or the right to peaceful enjoyment of their residents by, persons residing in the immediate vicinity of the premises; or

(d) Is drug-related criminal activity or violent criminal activity;

(6) Has a history or practice of renting units that fail to meet State or local housing codes; or

(7) Has not paid State or local real estate taxes, fines or assessments.

g. The new owner must agree to be bound by and comply with the HAP contract. The agreement must be in writing, and in a form acceptable to the PHA. The new owner must give the PHA a copy of the executed agreement.

15. Written Notices. Any notice by the PHA or the owner in connection with this contract must be in writing.

16. Entire Agreement: Interpretation

a. The HAP contract contains the entire agreement between the owner and the PHA.

b. The HAP contract shall be interpreted and implemented in accordance with HUD requirements, including the HUD program regulations at 24 Code of Federal Regulations Part 982.

Housing Assistance Payments Contract
(HAP Contract)
Section 8 Tenant-Based Assistance
Housing Choice Voucher Program

and Urban Development
Office of Public and Indian Housing

## Part C of HAP Contract: Tenancy Addendum

1. **Section 8 Voucher Program**

   a. The owner is leasing the contract unit to the tenant for occupancy by the tenant's family with assistance for a tenancy under the Section 8 housing choice voucher program (voucher program) of the United States Department of Housing and Urban Development (HUD).

   b. The owner has entered into a Housing Assistance Payments Contract (HAP contract) with the PHA under the voucher program. Under the HAP contract, the PHA will make housing assistance payments to the owner to assist the tenant in leasing the unit from the owner.

2. **Lease**

   a. The owner has given the PHA a copy of the lease, including any revisions agreed by the owner and the tenant. The owner certifies that the terms of the lease are in accordance with all provisions of the HAP contract and that the lease includes the tenancy addendum.

   b. The tenant shall have the right to enforce the tenancy addendum against the owner. If there is any conflict between the tenancy addendum and any other provisions of the lease, the language of the tenancy addendum shall control.

3. **Use of Contract Unit**

   a. During the lease term, the family will reside in the contract unit with assistance under the voucher program.

   b. The composition of the household must be approved by the PHA. The family must promptly inform the PHA of the birth, adoption or court-awarded custody of a child. Other persons may not be added to the household without prior written approval of the owner and the PHA.

   c. The contract unit may only be used for residence by the PHA-approved household members. The unit must be the family's only residence. Members of the household may engage in legal profitmaking activities incidental to primary use of the unit for residence by members of the family.

   d. The tenant may not sublease or let the unit.

   e. The tenant may not assign the lease or transfer the unit.

4. **Rent to Owner**

   a. The initial rent to owner may not exceed the amount approved by the PHA in accordance with HUD requirements.

   b. Changes in the rent to owner shall be determined by the provisions of the lease. However, the owner may not raise the rent during the initial term of the lease.

   c. During the term of the lease (including the initial term of the lease and any extension term), the rent to owner may at no time exceed:

      (1) The reasonable rent for the unit as most recently determined or redetermined by the PHA in accordance with HUD requirements, or

      (2) Rent charged by the owner for comparable unassisted units in the premises.

5. **Family Payment to Owner**

   a. The family is responsible for paying the owner any portion of the rent to owner that is not covered by the PHA housing assistance payment.

   b. Each month, the PHA will make a housing assistance payment to the owner on behalf of the family in accordance with the HAP contract. The amount of the monthly housing assistance payment will be determined by the PHA in accordance with HUD requirements for a tenancy under the Section 8 voucher program.

   c. The monthly housing assistance payment shall be credited against the monthly rent to owner for the contract unit.

   d. The tenant is not responsible for paying the portion of rent to owner covered by the PHA housing assistance payment under the HAP contract between the owner and the PHA. A PHA failure to pay the housing assistance payment to the owner is not a violation of the lease. The owner may not terminate the tenancy for nonpayment of the PHA housing assistance payment.

   e. The owner may not charge or accept, from the family or from any other source, any payment for rent of the unit in addition to the rent to owner. Rent to owner includes all housing services, maintenance, utilities and appliances to be provided and paid by the owner in accordance with the lease.

   f. The owner must immediately return any excess rent payment to the tenant.

6. **Other Fees and Charges**

   a. Rent to owner does not include cost of any meals or supportive services or furniture which may be provided by the owner.

   b. The owner may not require the tenant or family members to pay charges for any meals or supportive services or furniture which may be provided by the owner. Nonpayment of any such charges is not grounds for termination of tenancy.

   c. The owner may not charge the tenant extra amounts for items customarily included in rent to owner in the locality or provided at no additional cost to unsubsidized tenants in the premises.

7. **Maintenance, Utilities, and Other Services**

   a. Maintenance

      (1) The owner must maintain the unit and premises in accordance with the HQS.

      (2) Maintenance and replacement (including redecoration) must be in accordance with the standard practice for the building concerned as established by the owner.

b.  Utilities and appliances

(1)  The owner must provide all utilities needed to comply with the HQS.

(2)  The owner is not responsible for a breach of the HQS caused by the tenant's failure to:

(a)  Pay for any utilities that are to be paid by the tenant.

(b)  Provide and maintain any appliances that are to be provided by the tenant.

c.  Family damage. The owner is not responsible for a breach of the HQS because of damages beyond normal wear and tear caused by any member of the household or by a guest.

d.  Housing services.  The owner must provide all housing services as agreed to in the lease.

3.  Termination of Tenancy by Owner

a.  Requirements. The owner may only terminate the tenancy in accordance with the lease and HUD requirements.

b.  Grounds. During the term of the lease (the initial term of the lease or any extension term), the owner may only terminate the tenancy because of:

(1)  Serious or repeated violation of the lease;

(2)  Violation of Federal, State, or local law that imposes obligations on the tenant in connection with the occupancy or use of the unit and the premises;

(3)  Criminal activity or alcohol abuse (as provided in paragraph c); or

(4)  Other good cause (as provided in paragraph d).

c.  Criminal activity or alcohol abuse.

(1)  The owner may terminate the tenancy during the term of the lease if any member of the household, a guest or another person under a resident's control commits any of the following types of criminal activity:

(a)  Any criminal activity that threatens the health or safety of, or the right to peaceful enjoyment of the premises by, other residents (including property management staff residing on the premises);

(b)  Any criminal activity that threatens the health or safety of, or the right to peaceful enjoyment of their residences by, persons residing in the immediate vicinity of the premises;

(c)  Any violent criminal activity on or near the premises; or

(d)  Any drug-related criminal activity on or near the premises.

(2)  The owner may terminate the tenancy during the term of the lease if any member of the household is:

(a)  Fleeing to avoid prosecution, or custody or confinement after conviction, for a crime, or attempt to commit a crime, that is a felony under the laws of the place from which the individual flees, or that, in the case of the State of New Jersey, is a high misdemeanor; or

(b)  Violating a condition of probation or parole under Federal or State law.

(3)  The owner may terminate the tenancy for criminal activity by a household member in accordance with this section if the owner determines that the household member has committed the criminal activity, regardless of whether the household member has been arrested or convicted for such activity.

(4)  The owner may terminate the tenancy during the term of the lease if any member of the household has engaged in abuse of alcohol that threatens the health, safety or right to peaceful enjoyment of the premises by other residents.

d.  Other good cause for termination of tenancy

(1)  During the initial lease term, other good cause for termination of tenancy must be something the family did or failed to do.

(2)  During the initial lease term or during any extension term, other good cause includes:

(a)  Disturbance of neighbors,

(b)  Destruction of property, or

(c)  Living or housekeeping habits that cause damage to the unit or premises.

(3)  After the initial lease term, such good cause includes:

(a)  The tenant's failure to accept the owner's offer of a new lease or revision;

(b)  The owner's desire to use the unit for personal or family use or for a purpose other than use as a residential rental unit; or

(c)  A business or economic reason for termination of the tenancy (such as sale of the property, renovation of the unit, the owner's desire to rent the unit for a higher rent).

e.  Eviction by court action. The owner may only evict the tenant by a court action.

f.  Owner notice of grounds

(1)  At or before the beginning of a court action to evict the tenant, the owner must give the tenant a notice that specifies the grounds for termination of tenancy. The notice may be included in or combined with any owner eviction notice.

(2)  The owner must give the PHA a copy of any owner eviction notice at the same time the owner notifies the tenant.

(3)  Eviction notice means a notice to vacate, a complaint or other initial pleading used to begin an eviction action under State or local law.

9.  Lease: Relation to HAP Contract

If the HAP contract terminates for any reason, the lease terminates automatically.

10.  PHA Termination of Assistance

The PHA may terminate program assistance for the family for any grounds authorized in accordance with HUD requirements. If the PHA terminates program assistance for the family, the lease terminates automatically.

1.   Family Move Out

   The tenant must notify the PHA and the owner before the family moves out of the unit.

2.   Security Deposit

   a.   The owner may collect a security deposit from the tenant. (However, the PHA may prohibit the owner from collecting a security deposit in excess of private market practice, or in excess of amounts charged by the owner to unassisted tenants. Any such PHA-required restriction must be specified in the HAP contract.)

   b.   When the family moves out of the contract unit, the owner, subject to State and local law, may use the security deposit, including any interest on the deposit, as reimbursement for any unpaid rent payable by the tenant, any damages to the unit or any other amounts that the tenant owes under the lease.

   c.   The owner must give the tenant a list of all items charged against the security deposit, and the amount of each item. After deducting the amount, if any, used to reimburse the owner, the owner must promptly refund the full amount of the unused balance to the tenant.

   d.   If the security deposit is not sufficient to cover amounts the tenant owes under the lease, the owner may collect the balance from the tenant.

13.   Prohibition of Discrimination

   In accordance with applicable equal opportunity statutes, Executive Orders, and regulations, the owner must not discriminate against any person because of race, color, religion, sex, national origin, age, familial status or disability in connection with the lease.

14.   Conflict with Other Provisions of Lease

   a.   The terms of the tenancy addendum are prescribed by HUD in accordance with Federal law and regulation, as a condition for Federal assistance to the tenant and tenant's family under the Section 8 voucher program.

   b.   In case of any conflict between the provisions of the tenancy addendum as required by HUD, and any other provisions of the lease or any other agreement between the owner and the tenant, the requirements of the HUD-required tenancy addendum shall control.

15.   Changes in Lease or Rent

   a.   The tenant and the owner may not make any change in the tenancy addendum. However, if the tenant and the owner agree to any other changes in the lease, such changes must be in writing, and the owner must immediately give the PHA a copy of such changes. The lease, including any changes, must be in accordance with the requirements of the tenancy addendum.

   b.   In the following cases, tenant-based assistance shall not be continued unless the PHA has approved a new tenancy in accordance with program requirements and has executed a new HAP contract with the owner:

      (1)   If there are any changes in lease requirements governing tenant or owner responsibilities for utilities or appliances;

      (2)   If there are any changes in lease provisions governing the term of the lease;

      (3)   If the family moves to a new unit, even if the unit is in the same building or complex.

   c.   PHA approval of the tenancy, and execution of a new HAP contract, are not required for agreed changes in the lease other than as specified in paragraph b.

   d.   The owner must notify the PHA of any changes in the amount of the rent to owner at least sixty days before any such changes go into effect, and the amount of the rent to owner following any such agreed change may not exceed the reasonable rent for the unit as most recently determined or redetermined by the PHA in accordance with HUD requirements.

16.   Notices

   Any notice under the lease by the tenant to the owner or by the owner to the tenant must be in writing.

17.   Definitions

Contract unit.  The housing unit rented by the tenant with assistance under the program.

Family.  The persons who may reside in the unit with assistance under the program.

HAP contract.  The housing assistance payments contract between the PHA and the owner. The PHA pays housing assistance payments to the owner in accordance with the HAP contract.

Household.  The persons who may reside in the contract unit. The household consists of the family and any PHA-approved live-in aide. (A live-in aide is a person who resides in the unit to provide necessary supportive services for a member of the family who is a person with disabilities.)

Housing quality standards (HQS).  The HUD minimum quality standards for housing assisted under the Section 8 tenant-based programs.

HUD.  The U.S. Department of Housing and Urban Development.

HUD requirements.  HUD requirements for the Section 8 program. HUD requirements are issued by HUD headquarters, as regulations, Federal Register notices or other binding program directives.

Lease.  The written agreement between the owner and the tenant for the lease of the contract unit to the tenant. The lease includes the tenancy addendum prescribed by HUD.

PHA.  Public Housing Agency.

Premises.  The building or complex in which the contract unit is located, including common areas and grounds.

Program.  The Section 8 housing choice voucher program.

Rent to owner.  The total monthly rent payable to the owner for the contract unit. The rent to owner is the sum of the portion of rent payable by the tenant plus the PHA housing assistance payment to the owner.

Section 8.  Section 8 of the United States Housing Act of 1937 (42 United States Code 1437f).

Tenant.  The family member (or members) who leases the unit from the owner.

Voucher program.  The Section 8 housing choice voucher program. Under this program, HUD provides funds to an PHA for rent subsidy on behalf of eligible families. The tenancy under the lease will be assisted with rent subsidy for a tenancy under the voucher program.