# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **THEODORE HAYES,** *et al.* | : | **CIVIL ACTION** |
| *Plaintiffs* | : | |
| | : | **NO. 15-2617** |
| **v.** | : | |
| | : | |
| **PHILIP E. HARVEY** | : | |
| *Defendant* | : | |

NITZA I. QUIÑONES ALEJANDRO, J.                                   MAY 10, 2016

**FILED**

MAY 10 2016

MICHAEL E. KUNZ, Clerk
By_____ Dep Clerk

## MEMORANDUM OPINION

**INTRODUCTION**

This is an action seeking declaratory judgment and injunctive relief under the United States Housing Act of 1937 (the "Housing Act"), as amended, 42 U.S.C. §1437f. Presently, before this Court are the parties' cross-motions for summary judgment filed pursuant to Federal Rule of Civil Procedure 56, [ECF 16 and 17], which have fully briefed the issues.[1] The parties' dispute arose from the decision of Philip E. Harvey ("Defendant") in February 2015, to not renew the Section 8 tenant-based housing assistance payment contract and the related lease agreement with Theodore Hayes and Aqeela Fogle (collectively "Plaintiffs" or the "Hayes Family"), set to expire naturally on April 30, 2015. Specifically, the parties disagree as to their respective rights and obligations as owner/landlord and tenant under various provisions of the Housing Act.

For the reasons set forth, Plaintiffs' motion for summary judgment is denied, and Defendant's motion for summary judgment is granted.

---

[1]     This Court has also considered each of the parties' respective reply briefs, [ECF 22 and 23], and the *Amicus Curiae* Brief of National Housing Law Project in Support of Plaintiffs' Motion for Summary Judgment. [ECF 21]. The Court is appreciative to the National Housing Law Project for submitting its *amicus* brief, which provided great insight into the legislative history of the statute at the center of the parties' dispute.

## BACKGROUND

The relevant facts in this case were drawn from the "Statement of Undisputed Facts," submitted by Plaintiffs, [ECF 16-1], which Defendant does not contest but, instead, supplements with additional facts. [ECF 17]. These facts are summarized as follows:

Plaintiffs Theodore Hayes and Aqeela Fogle are a Section 8 voucher tenant family who live at 538B Pine Street, Philadelphia, Pennsylvania (the "Property"). This residence was built in 1982 as part of Washington Square East, a Section 8 *project-based* housing development in the Society Hill area of Philadelphia, and was federally subsidized pursuant to Section 8 of the United States Housing Act of 1937, 42 U.S.C. §1437f. The Washington Square East complex consisted of three duplex row homes, totaling six units, and covered 536-540 Pine Street.

In 2008, Pine Street Associates, the owners of Washington Square East, chose not to renew its *project-based* Section 8 contract and sent the then existing tenants a one-year opt-out notice advising the tenants that the Section 8 contract was set to expire on January 17, 2009. Thereafter, the Philadelphia Housing Authority (the "PHA"), the local public housing authority charged with administering tenant-based assistance programs, provided each of the Washington Square East tenants, including Plaintiffs, with Enhanced Vouchers, in accordance with the Housing Act, 42 U.S.C. §1437f(t). Plaintiffs chose to remain in 538B Pine Street.[2]

In August 2010, Pine Street Associates sold the Property, (536-540 Pine Street), to Defendant for $1.2 million, free and clear of any impediments, encumbrances, liens and/or restrictions. The recorded deed contains no restrictions on the residential rental use of the premises.

On November 8, 2010, Defendant signed a Section 8 voucher lease (the "Lease") with Mrs. Florence Hayes, the head of household at the time for the Hayes Family, regarding the 538B Pine Street unit. The term of the Lease was retroactive to May 11, 2010, with an initial termination date of April 30, 2011, but subject to automatic renewal for another one-year term. The Lease, however, is silent as to the timing of any notice requirement by the

---

[2]     It is unclear from the factual record provided whether Plaintiffs entered into some type of lease renewal with Pine Street Associates between January 17, 2009 and August 2010, when the property was sold to Defendant.

landlord/owner for the termination of the Lease at the end of a term. The parties renewed the Lease in 2011 for a two-year term and again in 2013. The most recent Lease term ended on April 30, 2015.

In its pertinent section, the Lease provides that the owner may only terminate the tenancy or lease on the following grounds:

> 1. Serious or repeated violation of the terms and conditions of the lease.
>
> 2. Violation of Federal, State or local law that impose obligations on the Tenant in connection with the occupancy, the contract unit and the premises.
>
> 3. Criminal activity . . .
>
> ***
>
> 4. Other good cause. "Other good cause" may include, but is not limited to, any of the following examples:
>
> I. Failure by the Tenant family to accept the offer of a new lease or revision after the first year of the lease;
>
> II. A family history of disturbance of neighbors or destruction of property, or of living or housekeeping habits resulting in damage to the unit or property;
>
> III. The Owner's desire to utilize the unit for personal or family use or for a purpose other than use as a residential unit after the first year of the lease;
>
> IV. A business or economic reason for termination of the tenancy (such as sale of property, renovation of the unit, desire to rent the unit at a higher rental) after the first year of the lease.
>
> Note: The Owner must give PHA a copy of any Owner eviction notice of Tenant at the same time that the Owner gives notice to Tenant.

On the date the parties entered into the Lease, Defendant also entered into a Housing Assistance Payments Contract (the

"HAP Contract"), with the PHA, pursuant to the "Section 8 *Tenant-Based* Assistance Housing Choice Voucher Program." (*See* Exhibit S) (emphasis added). Under its stated "purpose" provision, the HAP Contract provided:

> This is a HAP contract between the PHA and the owner. The HAP contract is entered to provide assistance for the family under the Section 8 voucher program (see HUD program regulations at 24 Code of Federal Regulations Part 982).

The HAP Contract similarly restricts the grounds on which an owner can terminate the Lease.

On February 2, 2015, Mrs. Florence Hayes, the original head of household on the Lease, passed away. The PHA removed Mrs. Hayes' name from the Lease and issued an addendum, listing and identifying Plaintiff Theodore Hayes on the Lease as the head of household.

On February 17, 2015, Defendant sent a "Nonrenewal Letter" to the Hayes Family indicating his intention to not renew the Lease due to the death of Mrs. Florence Hayes (the named head of household), and requiring that the apartment be vacated by the end of the current term, April 30, 2015. The letter also advised the Hayes Family of Defendant's intention to fully renovate the apartment after they vacated the premises. A copy of the letter was also sent to the PHA.

On May 1, 2015, Defendant sent the Hayes Family a "Notice to Vacate," which referenced the earlier letter and repeated Defendant's intention to not renew the Lease. This notice again advised the Hayes Family of Defendant's intention to renovate the property and to have a family member move into the premises. The letter provided the Hayes Family five additional days to vacate the premises before eviction proceedings would be initiated.

On May 12, 2015, Plaintiffs filed the instant complaint, seeking declaratory and injunctive relief; *to wit*: an injunction precluding Defendant from evicting Plaintiffs from the Property.

## LEGAL STANDARD

Rule 56 governs the summary judgment motion practice. Fed. R. Civ. P. 56. Specifically, this rule provides that summary judgment is appropriate "if the movant shows that there is no

4

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* A fact is "material" if proof of its existence or non-existence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Under Rule 56, the court must view the evidence in the light most favorable to the non-moving party. *Galena v. Leone*, 638 F.3d 186, 196 (3d Cir. 2011).

Rule 56(c) provides that the movant bears the initial burden of informing the court of the basis for the motion and identifying those portions of the record which the movant "believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This burden can be met by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case." *Id.* at 322.

After the moving party has met its initial burden, summary judgment is appropriate if the nonmoving party fails to rebut the moving party's claim by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" that show a genuine issue of material fact or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." *See* Fed. R. C. P. 56(c)(1)(A-B). The nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmoving party may not rely on bare assertions, conclusory allegations or suspicions, *Fireman's Ins. Co. of Newark v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982), nor rest on the allegations in the pleadings. *Celotex*, 477 U.S. at 324. Rather, the nonmoving party must "go

beyond the pleadings" and either by affidavits, depositions, answers to interrogatories, or admissions on file, "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.*

Here, the parties agree that there are no genuine issues of material fact; however, they each argue that the undisputed facts require the entry of judgment in their respective favor. The parties' dispute is premised upon their differing interpretation of their respective rights and obligations under various provisions of the Housing Act. Specifically, Plaintiffs argue that the "enhanced voucher" provision in Section 8 of the Housing Act, 42 U.S.C. §1437f(t)(1)(B), which was implicated on January 9, 2008, when the Property's previous owner provided Plaintiffs the requisite one-year notice of its intention to opt out of the Section 8, project-based assistance contract and lease, affords them the right to remain in the Property for as long as it remains a rental property and, thus, Defendant is prohibited from evicting them. In the alternative, Plaintiffs argue that under the Housing Act their lease can only be terminated for cause.

Defendant refutes Plaintiffs' arguments and contends that he is bound only by the terms of the tenant-based Housing Assistance Payment (HAP) Contract and related lease that *he* entered into with Plaintiffs and the PHA, and is not bound by any additional statutory and/or regulatory requirements for Section 8 housing arrangements. Defendant relies on the fact that he acquired the Property clear of any restrictions or encumbrances (as evidenced by the recorded deed), without any government funding assistance, and after the previous owner had provided notice of its intention to opt out from the project-based Section 8 program. Defendant also argues that nothing in the statute or regulations prohibit him from effectively opting out of the tenant-based program at the end of the applicable contract and lease terms.

**SECTION 8 HOUSING PROGRAM HISTORY**

To better understand the issues involved and to address the parties' respective arguments, this Court will briefly outline the relevant history of Section 8 housing.  The *Section 8 project-based subsidized*-housing program commenced in the 1960s, when the federal government began subsidizing and insuring mortgage loans for the construction of affordable housing for low-income tenants.  *See* Housing and Urban Development Act of 1968, Pub. L. No. 90-448, §§201(a), 236(a)-(g), 82 Stat. 476, 498-503 (1968) (codified, as amended, at 12 U.S.C. §1715z-1 (2000)).  Under the program, property owners could prepay the loans after twenty years and no longer be part of or subject to the program's restrictions.  24 C.F.R. §221.524(a)(ii) (1970).

The *Housing Choice Voucher Program*, also part of the Section 8 program, is a federal program administered by the United States Department of Housing and Urban Development ("HUD"), pursuant to the Housing and Community Development Act of 1974, 42 U.S.C. §1437f, "[f]or the purpose of aiding low-income families in obtaining a decent place to live and of promoting economically mixed housing, assistance payments may be made with respect to existing housing in accordance with the provisions of this section."  *Id.* at §1437f(a).  The statute authorizes two primary forms of assistance payments:  "project-based" and "tenant-based."  *See* 24 C.F.R. §982.1(b)(1).  In *project-based* programs, the federal government makes payments to owners of specific housing developments or units on behalf of eligible low-income tenants.  *Id.* Under the *tenant-based* program (commonly, referred to as the "voucher" program), the assistance payments follow a particular tenant if he or she moves.  42 U.S.C. §1437f(o) and (r); 24 C.F.R. §982.1(b)(1).  Public housing authorities (such as, the PHA) locally administer the tenant-based voucher assistance payments.  In the project-based voucher program, tenants pay a statutorily capped portion of their income toward rent, and HUD pays the remainder up to the

approved rent as determined in the housing assistance payment ("HAP") contract between HUD and the owner/landlord.  42 U.S.C. §1437a(a)(1).  In the tenant-based voucher program, the tenant's rent contributions are regulated by statute, but could exceed 30 percent of the tenant's income if the rent for the unit exceeds the PHA-established payment standard.  The PHA pays the remainder pursuant to the HAP contract with the owner/landlord. 42 U.S.C. §1437f(o)(2)(c).

In the wake of various legislative changes which started in the mid-1990s, a growing number of HUD-subsidized and project-based Section 8 owners became eligible to prepay their subsidized mortgages, and/or to terminate or not renew their contracts with HUD.  *See Barrientos v. 1801-1825 Morton LLC*, 583 F.3d 1197, 1202-03 (9th Cir. 2009).  In order to protect subsidized or assisted tenants, Congress enacted new laws regulating how former HUD-subsidized or project-based Section 8 owners could prepay their mortgages or opt out of their Section 8 housing contracts.  *See, e.g.*, Emergency Low Income Housing Preservation Act of 1987, Pub. L. No. 100-242, Title II, 101 Stat. 1815, 1877-91 (1988); Low Income Housing Preservation and Resident Homeownership Act of 1990, Pub. L. No. 101-625, § 601(a), 104 Stat. 4079, 4249 (1990); Multifamily Assisted Housing Reform and Affordability Act, Pub. L. No. 105-65, Title V, §§501-579, 111 Stat. 1344, 1384-1424 (1997) (codified at 42 U.S.C. §1437f note); Pub. L. No. 105-276, §219, 112 Stat. 2461, 2487-88 (1998) (uncodified).  Under the current version of the applicable statute, for project-based Section 8 properties, an owner must provide the tenant and the Secretary of HUD with an opt-out notice at least one year before terminating or not renewing the contract, cannot evict tenants or increase rents until one year after providing such notice, and must comply with additional requirements established by the Secretary of HUD.  42 U.S.C. §1437f(c)(8)(A)-(D).

In 1999 and again in 2000, Congress undertook additional steps to provide and clarify protections for affected low-income families residing in project-based Section 8 housing, and enacted legislation that created enhanced vouchers. Pub. L. No. 106-74, §538, 113 Stat. 1047, 1122-24 (1999) (codified at 42 U.S.C. §1437f(t)); Pub. L. No. 106-246, §2801, 114 Stat. 511, 569 (2000) (codified as amended at 42 U.S.C. §1437f(t)).  These amendments allowed landlords to prepay their mortgages, and also increased the available subsidy to fair market value so as to allow the enhanced voucher tenants the option of remaining in the same property after the owner's prepayment.  That is, enhanced voucher recipients were provided larger subsidies to meet an opting-out owner's likely increase in rent.  An enhanced voucher is provided to a tenant following an "eligibility event," which includes the "termination or expiration of the contract for rental assistance under this section for such housing project. . . ."  42 U.S.C. §1437f(t)(2).

## DISCUSSION

Here, the issues presented center on the parties' disagreement over their respective rights and obligations under various provisions of the Housing Act.  Before addressing each parties' rights and obligations under the applicable statute, this Court will first address Defendant's argument that he is not bound by the Section 8 enhanced voucher provisions because he acquired the Property free and clear of encumbrances, without any federal funding assistance, and after the previous owner had provided notice of its intention to opt out from the Section 8 program.

Defendant's argument is incorrect since he fails to take into consideration the clear language of the Lease he admittedly entered into with Plaintiffs, which expressly references both the Housing Choice Voucher ("HCV") Program and the HAP Contract throughout.  For instance, the Lease defines both of these terms as follows:

> Housing Choice Voucher ("HCV") Program - The program
> formerly referred to as "Section 8."  Through the program HUD

9

provides funds to a HA [housing authority] for rent subsidy on behalf of an eligible family. The Tenant under this lease will be assisted with rent subsidy under the HCV program.

Housing Assistance Program ("HAP") Contract - The HAP contract is between PHA and the Owner of the contract unit. PHA pays the HAP to the owner in accordance with the HAP contract.

(Exhibit I, Model Lease Agreement, ¶2). The Lease expressly provides that "[t]he Owner [Phillip E. Harvey] will enter into the HAP contract with PHA under the HCV program. The purpose of the HAP contract is to assist the Tenant to lease this dwelling unit from the Owner for occupancy by the family with the Tenant-based assistance under the HCF Program." (*Id.* at ¶3; *see also* ¶20). Defendant admittedly entered into a HAP Contract, portions of which he attached to his brief as Exhibit S. As such, contrary to Defendant's argument and notwithstanding the fact that he purchased the Property without encumbrance from the previous owner who had opted out of the original project-based Section 8 contract/program, Defendant's tenant-based HAP contract and related Lease with Plaintiffs are governed by and subject to, *inter alia*, the Section 8 statute.

Though Defendant, as a party to a tenant-based HAP contract and related lease, is clearly subject to various provisions of the Housing Act, this finding does not end the dispute between the parties. As discussed below and contrary to Plaintiffs' arguments, Defendant is not precluded from opting out of the tenant-based HAP contract and the related lease at the end of the term of the lease and, if necessary, proceeding under state and local landlord-tenant laws to evict a holdover tenant.

Turning to the heart of the parties' disagreement, it is undisputed that Plaintiffs received and utilized *tenant-based* assistance enhanced vouchers after the Property's previous owner provided Plaintiffs the required one-year notice of its intention to not renew the then existing and governing project-based assistance contract. It is also undisputed that Plaintiffs continued to

receive and utilize these enhanced vouchers after Defendant purchased the Property and Defendant entered into a new HAP Contract with the PHA under the Section 8 Tenant-Based Assistance Housing Choice Voucher Program.

Plaintiffs argue that §1437f(t), which governs "enhanced vouchers," provides them the unfettered right to remain in the Property as long as the Property remains a rental property. The relevant portion of §1437f(t) provides:

> (B) the assisted family may elect to remain in the same project in which the family was residing on the date of the eligibility event for the project, and if, during any period the family makes such an election and continues to so reside, and the rent for the dwelling unit of the family in such project exceeds the applicable payment standard established pursuant to subsection (o) of this section for the unit, the amount of rental assistance provided on behalf of the family shall be determined using a payment standard that is equal to the rent for the dwelling unit (as such rent may be increased from time-to-time), subject to paragraph (10)(A) of subsection (o), of this section and any other reasonable limit prescribed by the Secretary, except that a limit shall not be considered reasonable for purposes of this subparagraph if it adversely affects such assisted families.

*Id.* 1437f(t)(1)(B).

Plaintiffs assert that this enhanced vouchers provision has created for enhanced voucher tenants, such as Plaintiffs, a right to remain in their rental homes using their enhanced vouchers for as long as they remain voucher-eligible and in occupancy, regardless of the desires of an owner to cease participating in the program. In so arguing, Plaintiffs are essentially contending that they are the beneficiaries of an endless or perpetual lease that must be renewed and can only be terminated by the owner/landlord for cause. Defendant disagrees and argues that no such unfettered right to remain in the Property exists, particularly where Defendant has effectively opted out of the tenant-based HAP Contract and related lease by having provided written notice of his intention not to renew the contracts at the April 30, 2015 expiration date. While neither

11

party has pointed to any binding case law directly on point, it is this Court's opinion that Plaintiffs' argument is misplaced and finds no support in, but rather is contradicted by, the statute itself and its legislative history.

Subsection (t) of §1437f, on which Plaintiffs rely to create and support their unfettered and perpetual right to remain in the Property, provides no such support. What this subsection provides in an enhanced voucher situation is that a tenant "may elect to remain in the same project. . . ." If the tenant so elects, and the rent for the property "exceeds the applicable payment standard established pursuant to subsection (o)" of the section, the Secretary shall determine the amount of rental assistance to be provided to the tenant by "using a payment standard that is equal to the rent for the dwelling unit, subject to paragraph (10)(A) of subsection (o) of this section and any other reasonable limit prescribed by the Secretary. . . ." Significantly, this provision is silent as to the opting-out owner's obligations or in imposing any continued obligation on the owner to remain in the program or to continue renting to said tenant in situations where the lease has expired. Simply put, while this subsection authorizes and requires the Secretary to provide a tenant who wishes to remain in a rental housing unit additional rental assistance, this subsection does not obligate an owner to continue participating in a Section 8 housing program once the owner has opted out. Nowhere does this provision impose any obligations on the owner.

Notably, while the current version of the statute, and in particular those subsections dealing with the enhanced vouchers, is silent as to any obligation on the part of an owner/landlord opting out of a project-based contract to renew a lease with an enhanced voucher recipient, previous versions of the statute, prior to its amendment in 1996, contained what was deemed and called the "endless lease" provision. The then so-called "endless lease" provision

prevented owners/landlords from refusing to renew the leases of Section 8 tenants at the conclusion of a lease period, "except for serious or repeated violation of the terms and conditions of the lease, for violation of applicable Federal, State or local law, or for other good cause." 42 U.S.C. §1437f(d)(1)(B)(ii) (repealed 1996). This provision – as well as a "take one, take all" provision – was considered onerous and thought to diminish landlords' incentives to provide Section 8 housing. Significantly, and as noted by the Ninth Circuit Court of Appeals in *Barrientos*, the current version of §1437f(o)(7)(C), was part of a number of amendments to the statute intended to eliminate the so-called "endless lease" provision by removing the "good cause" requirement for nonrenewal, though retaining the "good cause" requirement for termination of a tenancy during the term of the lease. 583 F.3d at 1205; *see also Park Village Apartment Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d 1150, 1161 (9th Cir. 2011) (noting "Congress's clear intention in the 1996 amendment to the Act to end so-called 'endless leases,' under which owners could not refuse to renew the leases of Section 8 tenants at the conclusion of a lease term. . . ."). In this Court's opinion, Congress' retraction of the "endless lease" provision signals Congress' intent that an owner/landlord, opting out of a Section 8 housing contract, is not obligated to renew a lease for either a voucher recipient or an enhanced voucher recipient, after the contract's term has ended.[3]

---

[3]     The intention to allow for termination of a HAP lease at the end of its specified term was also evidenced by the comments that appeared in the Federal Register pertaining to HUD's 1995 rule changes: "The rule and the statute provide that an owner may terminate an assisted tenancy for serious or repeated violation of the lease, violation of tenancy obligations under federal, State or local law, or other good cause. The final rule provides that the owner may terminate tenancy for these grounds 'during the term of the lease.' The federal requirements for termination of tenancy only apply during the term of the assisted lease, but do not apply after a termination of the assisted lease – for example, where the lease has terminated automatically because the HAP contract has terminated." 60 Fed. Reg. 34,660, 34,673 (July 30, 1995). As noted, a year later, Congress repealed the "endless lease" provision by eliminating the "good cause" requirement for nonrenewal, but retaining the "good cause" requirement for termination of a tenancy during the term of the lease. *See Barrientos*, 583 F.3d 1205.

Other sections of the existing statute also rebut Plaintiffs' argument for an endless lease and support, to the contrary, Congress' intent that an owner/landlord can effectively terminate the owner's participation in Section 8 tenant-based (voucher) assistance housing, at the end of the contract's stated term. For example, §1437f(1)(c)(8)(A) expressly sets forth the notice requirements for an owner who has decided to terminate a project-based HAP contract. It provides as follows:

> Not less than one year before termination of any contract under which assistance payments are received under this section, other than a contract for tenant-based assistance under this section, an owner shall provide written notice to the Secretary and the tenants involved of the proposed termination. The notice shall also include a statement that, if the Congress makes funds available, *the owner and the Secretary may agree to a renewal of the contract, thus avoiding termination*, and that in the event of termination the Department of Housing and Urban Development will provide tenant-based rental assistance to all eligible residents, enabling them to choose the place they wish to rent, *which is likely to include the dwelling unit in which they currently reside. Any contract covered by this paragraph that is renewed* may be renewed for a period of up to 1 year or any number of years, with payments subject to the availability of appropriations for any year.

> (B) In the event the owner does not provide the notice required, the owner may not *evict* the tenants or increase the tenants' rent payment until such time as the owner has provided the notice and 1 year has elapsed. The Secretary *may allow the owner to renew* the terminating contract for a period of time sufficient to give tenants 1 year of advance notice under such terms and conditions as the Secretary may require.

§1437f(8)(A)-(B) (emphasis added). As supported by the highlighted language, in enacting this statute, Congress expressly contemplated situations where an owner would and could decide not to renew a lease at its natural expiration. The statute provides that the owner "*may* agree to a renewal. . . ." *Id.* (emphasis added). It does not say that the owner "must" agree to a renewal. In the same vein, this provision's inclusion of the phrase "[a]ny contract covered by this paragraph that is renewed," clearly contemplates an owner's decision to not renew the contract.

The provision also provides that the tenant's choices are "*likely* to include the dwelling unit in which they currently reside." *Id.* (emphasis added). This equally implies that the tenant's choices may not include their current rental property. In addition, the language used in this provision clearly reflects Congress' intent that an opting-out owner/landlord could "evict" the tenant at the expiration of the lease term.

The statute also defines "termination" of a HAP contract to include "*the expiration of the assistance contract* or *an owner's refusal to renew the assistance contract*. . . ." §1437f(c)(8)(D) (emphasis added). As such, the statute expressly contemplates situations where the lease expires on its own terms, *i.e.*, at the end of the term. This conclusion is supported by the decision of the First Circuit Court of Appeals in *People to End Homelessness, Inc. v. Develco Singles Apartments Assocs. ("PEH")*, 339 F.3d 1, 9 (1st Cir. 2003), wherein it held that an owner/landlord of Section 8 housing was not required to renew a HAP contract/lease once it expired by its own terms. In *PEH*, the owners of apartment buildings notified their Section 8 tenants that they did not intend to renew their HAP contracts. 339 F.3d at 4. The owners provided notice six weeks before the HAP contracts expired. *Id.* HUD did not object to the owners' decision, and agreed to issue housing vouchers to the tenants. *Id.* A nonprofit organization then filed an action the day before the HAP contracts were to expire. *Id.* The organization alleged that the owners violated 42 U.S.C. §1437f(c)(8) by failing to provide adequate notice, and that HUD violated federal law by permitting the owners to do so. *Id.* The district court entered a stipulated restraining order prohibiting the owners from either evicting a Section 8 tenant or increasing the rent payment until the one-year period required by §1437f(c)(8)(A) had elapsed. *Id.* The owners complied with the order. Sometime thereafter, the district court dismissed the action. On appeal, the First Circuit concluded that the district court

had provided all of the redress to which the organization was entitled by entering the restraining order. *Id.* at 9. With regards to the claims against the owners, the Court of Appeals concluded that the plaintiffs lacked standing since the restraining order provided plaintiffs all the relief to which they were entitled, *i.e.*, precluding eviction until one year after the notice. Thus, the First Circuit held that an owner can decide not to renew a project-based HAP contract so long as the tenants are given the proper one-year notice. *See also Owens v. Charleston Housing Authority*, 336 F. Supp. 2d 934, 943 (E.D. Mo. 2004) (holding that the decision whether to renew a HAP "rests entirely" with the owner and that an owner has no legal obligation to renew).

Like in *PEH*, Plaintiffs here effectively have been provided the sole remedy to which they *might* be entitled.[4] As stated, on February 17, 2015, Defendant provided Plaintiffs written notice that he did not intend to renew the HAP lease, which was set to expire on April 30, 2015. Though the notice provided Plaintiffs only 72 days' notice, rather than the one-year notice required by §1437f(c)(8)(A), Defendant subsequently agreed to not evict Plaintiffs until this litigation was resolved. As of the time of this Memorandum Opinion, more than a year has passed since Defendant provided Plaintiffs notice of his intent not to renew the HAP lease. As such, like the plaintiffs in *PEH*, Plaintiffs here have been provided full redress to which they are entitled, *i.e.*, one year's notice of the owner/landlord's intention to not renew the lease.[5]

---

[4]     As discussed below, the one-year notice provision only applies to an owner's decision to terminate or not renew a project-based assistance program, and not a tenant-based assistance program like that at issue here.

[5]     Under the circumstances, it would not have made any sense for Defendant to have included the other required language pertaining to the availability of "tenant-based rental assistance" in his non-renewal notice, since Plaintiffs had already been put on notice of such by the previous owner and had been receiving such assistance since 2009. *Cf., Owens v. Charleston Housing Authority*, 336 F. Supp. 2d 934, 946 (D. Mo. 2004) (holding that owner's notice "substantially complied" with federal requirements because the owner intended to demolish the housing units and noted that "[a]lthough the notice did not follow the statutory language, it would have been misleading had it strictly followed the statute.").

Notwithstanding, the one-year notice provision in §1437f(c)(8)(A), by its own express terms, does not apply in an enhanced voucher situation like this case. The relevant portion of §1437f(c)(8)(A) provides: "[n]ot less than one year before termination of any contract under which assistance payments are received under this section, *other than a contract for tenant-based assistance under this section*. . . ." (Emphasis added). Thus, by its own terms, this one-year notice provision does not apply where the owner/landlord is party to a tenant-based assistance contract, rather than a project-based contract. Here, the parties agree, and the submitted evidence confirms, that Defendant entered into a "tenant-based assistance" contract with the PHA. (*See* Exhibit S, HAP Contract). As such, Defendant was not required to give one-year notice of his intention not to renew the tenant-based assistance contract.

Plaintiffs' argument that their "right to remain" can only be terminated if the assisted family moves from the project or if the voucher is made available for use by any family other than the original family is also misplaced. Section 1437f(t), on which Plaintiffs rely for support, actually refutes Plaintiffs' argument. This subsection, entitled "Enhanced Vouchers," expressly provides that enhanced vouchers "shall be voucher assistance under subsection (o) of this section. . . ." Subsection (t) goes on to provide a limited set of additional requirements that do not otherwise apply to ordinary vouchers. These additional requirements, however, merely provide a different set of criteria for calculating the assisted tenant's portion of the rent, the reasonable amount of rent, and the amount of rental assistance to be provided to the tenant. *See* §1437f(t)(1)(A)-(D). Again, they are silent as to any obligations on the part of an owner/landlord who has provided notice of his intent not to renew a tenant-based HAP contract and lease.

In any event, subsection (o) of the statute applies to enhanced vouchers.[6]  That subsection outlines the voucher program in detail, including the requirements for any HAP contract and lease.  Specifically, §1437f(o)(7), entitled "Leases and Tenancy," provides, in relevant part, as follows:

> Each housing assistance payment contract entered into by the public housing agency and the owner of a dwelling unit –
>
> (A) shall provide that the lease between the tenant and the owner shall be for a *term of not less than 1 year*, except that the public housing agency may approve a shorter term for an initial lease between the tenant and the dwelling unit owner if the public housing agency determines that such shorter term would improve housing opportunities for the tenant and if such shorter term is considered to be a prevailing local market practice;
>
> (B) shall provide that the dwelling unit owner shall offer leases to tenants assisted under this subsection that –
>
> (i) are in a standard form used in the locality by the dwelling unit owner; and
>
> (ii) contain terms and conditions that –
>
> (I) are consistent with State and local law; and
>
> (II) apply generally to tenants in the property who are not assisted under this section;
>
> (C) shall provide that *during the term of the lease*, the owner shall not terminate the tenancy except for serious or repeated violation

---

[6]       Notably, even the cases on which Plaintiffs rely recognize that an enhanced voucher tenant can be evicted for cause.  "Interpreting subsection (t) as creating tenancies insulated from eviction for any reason would erect a nearly insurmountable barrier to voluntary owner participation and would undercut the explicit intent of Congress."  *Barrientos v. 1801-1825 Morton, LLC*, 2007 WL 7213974, at *7 (C.D. Cal. Sept. 11, 2007).  "[E]ven though enhanced-voucher tenants have a right to remain in tenancy, Congress never intended to tie the hands of owners such that they are saddled with enhanced-voucher tenants who cannot be evicted for statutory cause."  *Id.* at *8.  HUD has also interpreted subsection (t) to be subject to the eviction grounds in subsection (o)(7).  *See* HUD Notice PIH 2001-4(IIA), *Section 8 Tenant-Based Assistance (Enhanced and Regular Housing Choice Vouchers) For Housing Conversion Actions-Policy and Processing Guidance* (Nov. 14, 2001) ("The owner may not terminate tenancy of a family that exercises its right to remain except for a serious or repeated lease violation or other good cause.").

of the terms and conditions of the lease, for violation of applicable
Federal, State, or local law, or for other good cause. . . .

This Court opines that this language evidences Congress' intent (also evidenced in other

subsections of the statute discussed above) that a participating owner/landlord can effectively

end his/her participation in Section 8 housing at the natural expiration of a Section 8 housing

lease. In particular, this subsection's reference to "a term of not less than 1 year" clearly implies

that a participating owner/landlord can enter into an enforceable one-year lease.

Plaintiffs' alternative argument that Defendant was precluded from terminating the lease

in the absence of "good cause" is also misplaced. The applicable subsection on which this

argument is based, §1437f(o)(7)(C), quoted above, only applies "during the term of the lease."

Inclusion of this clause, *i.e.*, "during the term of the lease," clearly implies that the prohibition on

termination of the lease does not apply where the lease has reached the end of its term. As such,

neither the voucher subsections nor the enhanced voucher subsections of the statute prohibit a

landlord/owner from evicting or not renewing a lease at the end of the lease's term. Again, by its

own plain meaning and terms, the prohibition only applies "during the term of the lease."

In addition, the non-binding cases on which Plaintiffs rely provide no support for their

arguments. In those cases, the courts addressed the rights and obligations of owners/landlords

and their tenants in situations where the owner/landlord was opting out of a ***project-based***

assistance contract. For the most part, the courts in those cases held that an owner/landlord who

was opting out of an underlying project-based assistance contract and related lease could not

evict the tenant without complying with the one-year notice provision and/or without complying

with local eviction laws. For example, in *Feemster v. BSA Limited Partnership*, 548 F.3d 1063,

1068 (D.C. Cir. 2008), the appellate court held that the Section 8 tenants' right to remain in their

homes, and to pay their rent with enhanced vouchers, after the owner had opted out of the

project-based assistance contract and lease, was secure only until their tenancies were validly terminated under local law.  Similarly, in *Barrientos v. 1801-1825 Morton, LLC*, 2007 WL 7213974, at *8 (C.D. Cal. Sept. 11, 2007), another case on which Plaintiffs rely, the court held that "even though enhanced-voucher tenants have a right to remain in tenancy, Congress never intended to tie the hands of owners such that they are saddled with enhanced-voucher tenants who cannot be evicted for statutory cause."  Thus, even under the non-binding decisions cited by Plaintiffs, the courts recognized that an owner/landlord who was opting out of a project-based assistance contract was not precluded by §1437f from evicting the Section 8 enhanced-voucher tenants under local law.  Grounds for such eviction under governing local law generally include the expiration of a lease term.

Plaintiffs' cases, none of which are binding on this Court, are inapposite here where it is undisputed that Defendant was never a party to a "project-based" assistance contract or lease.  Rather, the previous owner of the Property was party to the original "project-based" assistance contract and lease, but opted out of that project-based contract in 2008.  After purchasing the Property, Defendant entered into a "tenant-based" assistance contract and related lease, each for a one-year term.  These distinguishing facts, seemingly lost on Plaintiffs, make Plaintiffs' cited cases inapposite here.

In summary, it is undisputed that Defendant provided Plaintiffs with written notice of Defendant's intention not to renew either the tenant-based assistance contract with the PHA or the related lease with Plaintiffs, both of which expired by their own terms on April 30, 2015.  Although the one-year notice provision on which Plaintiffs rely does not apply here, the notice provision was satisfied here, nonetheless, since more than a year has passed since Defendant gave Plaintiffs written notice of his intent not to renew the lease.  Under the circumstances,

Defendant is entitled to have the Plaintiffs, within a reasonable period of time, vacate the Property, and if they refuse to comply, proceed through local eviction proceedings.

## CONCLUSION

Based upon the review of the undisputed facts and careful consideration of the Housing Act, for the reasons set forth herein, Plaintiffs' motion for summary judgment is denied, and Defendant's motion for summary judgment is granted.   An Order consistent with this Memorandum Opinion follows.

NITZA I. QUIÑONES ALEJANDRO, USDC J.