**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____
THEODORE HAYES and                          :
AQEELA FOGLE                                :
                                            :        Case No. 15-cv-2617
Plaintiffs,                                 :
                                            :
v.                                          :
                                            :
PHILIP E. HARVEY,                           :
                                            :
Defendant                                   :
_____:

**ORDER FOR SUMMARY JUDGMENT**

AND NOW THIS _____ of _____, the Court grants

plaintiffs' motion for summary judgment and hereby orders that Defendant Philip E. Harvey and

any person acting on his behalf refrain from evicting the Hayes family from 538B Pine Street for

reasons not based upon tenant misconduct that constitutes a material breach of the lease, or

taking any action to accomplish such an eviction.

Dated: _____          _____
                               U.S. District Court Judge

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

THEODORE HAYES and        :
AQEELA FOGLE        :
       :   Case No. 15-cv-2617
Plaintiffs,        :
       :
v.        :
       :
PHILIP E. HARVEY,        :
       :
Defendant        :
_____:

### PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

1.      Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Plaintiff[1], by and through her undersigned counsel, hereby moves for summary judgment on the claim asserted in her Complaint, that Defendant Harvey seeks to evict the Plaintiff in violation of her Right to Remain under the Enhanced Voucher section of the United States Housing Act of 1937, 42 U.S.C. § 1437f(t). Plaintiffs incorporate the attached Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment as if set forth at length. Plaintiff respectfully requests this Honorable Court grant her Motion for Summary Judgment and enter judgment in her favor and against the Defendant.

Dated:  November 27, 2019         Respectfully submitted,
        */s/ Rachel Garland*
        Rachel Garland and George Gould
        COMMUNITY LEGAL SERVICES, Inc.
        1424 Chestnut Street
        Philadelphia, PA 19102
        Telephone: 215-981-3778
        rgarland@clsphila.org
        *Attorneys for the Plaintiff*

---

[1] Original Plaintiffs in this case were Theodore Hayes and Aqeela Fogle, his niece. In May 2017, Mr. Hayes moved out of the property in question and withdrew from this case. *See* Exhibit A, paragraph 1 and Exhibit T.

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____
THEODORE HAYES and                       :
AQEELA FOGLE                             :
                                         :    Case No. 15-cv-2617
Plaintiffs,                              :
                                         :
v.                                       :
                                         :
PHILIP E. HARVEY,                        :
                                         :
Defendant                               :
_____:

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

I.   PRELIMINARY STATEMENT ................................................................................. 1

II.  STATEMENT OF UNDISPUTED FACTS .......................................................... 7

III. LEGAL STANDARD ............................................................................................. 7

IV.  ARGUMENT ........................................................................................................... 7

   A.  Congress created Enhanced Vouchers with the Right to Remain to prevent involuntary
       displacement of tenants like the Hayes family. .................................................. 7

   B.  Non-renewal for good cause of Enhanced Voucher tenancies must be related to tenant
       misconduct…………………………………………………………….………....11

   C.  The Hayes family have not breached their lease and therefore Defendant Harvey does
       not have good cause to evict them……….………….…………………...……………17

V.   CONCLUSION ........................................................................................................ 24

VI.  APPENDIX

   A.  Statement of Undisputed Facts

   B.  Deposition of Theodore Hayes

   C.  Deposition of Aqeela Fogle

   D.  Deposition of Philip E. Harvey

E.  Deposition of Allison Hindman-Harvey

F.  Pine Street Associates' One-Year Notice to Washington Square West Tenants

G.  Declaration of Roger Ciafre

      A.  Exhibit 1: PHA's 2010 Administrative Plan Enhanced Voucher Chapter 27

H.  Deed for 536-540 Pine Street

I.  Section 8 Housing Choice Voucher Lease for Hayes Family

J.  Interim Rent Addendum for Theodore Hayes

K.  February 17, 2015 Non-Renewal Notice to Hayes Family

L.  May 1, 2015 Five-Day Eviction Notice to Hayes Family

M.  Deposition of Elizabeth Hindman-Harvey

N.  Rental Property Listing for 540B Pine Street

O.  Rental Property Listing for 536B Pine Street

P.  Affidavit of Availability for Rent of 540B Pine Street

Q.  Municipal Court Complaint

R.  Municipal Court Order

S.  Counsel's Letter to Court Removing Theodore Hayes

T.  PHA Lease Addendum for Aqeela Fogle

U.  Defendant Harvey Request to PHA for Rent Increase

V.  PHA 2019 Lease Addendum

W.  Affidavit of Alison Hindman-Harvey

# I.    PRELIMINARY STATEMENT

The central issue in this case is the right of the Hayes family, and other similarly assisted families, under the federal Enhanced Voucher Statute to continued occupancy in their homes absent sufficient good cause to evict either during, or at the end of, their lease terms. *See* 42 U.S.C. § 1437f(t) ("Enhanced Voucher Statute"). The Third Circuit, in an en banc precedential decision, ruled in this case that the Enhanced Voucher Statute gives assisted tenants a strong anti-displacement right to continued occupancy ("Right to Remain"). This Right to Remain requires landlords to renew the leases of their Enhanced Voucher assisted tenants unless there is a good cause reason to evict them. *See Hayes v. Harvey*, 903 F.3d 32, 36 (3d Cir. 2018). The Third Circuit remanded to this Court to determine whether good cause existed under the particular circumstances of this case. *Id.* at 49. The Third Circuit's interpretation of the plain meaning of the Enhanced Voucher Statute and supporting legislative history is that this statutory Right to Remain is a distinctive right that provides Enhanced Voucher tenants with heightened protections to prevent their forced displacement from their homes. This essential anti-displacement principle requires that good cause grounds for a landlord to evict an Enhanced Voucher assisted tenant be limited to tenant misconduct.

Congress enacted Enhanced Voucher protections, codified into the Enhanced Voucher Statute in 1999, as a specific means of preventing the forced displacement of tenants when owners of their subsidized buildings chose to exit the subsidy program. The Enhanced Voucher Statute's unique purpose and protections must be understood in the historical context of two other related, yet distinct, housing subsidy programs—the project-based program and the regular tenant-based voucher program. While all three

1

federal subsidy programs stem from Section 8 of the United States Housing Act, 42 U.S.C. § 1437f, they each serve very different policy objectives and are governed by separate sections of the statute.

The first, privately-owned project-based subsidized housing originated in the 1960s when the federal government began subsidizing and insuring mortgage loans for the construction of affordable housing for low-income tenants.  *See* Housing and Urban Development Act of 1968, Pub. L. No. 90-448, §§ 201(a), 236(a)-(g), 82 Stat. 476, 498-503 (1968).  Because those restricted rents were often still unaffordable to lower-income families, Congress then created the Section 8 program in 1974, which provided additional rental assistance for both new and existing subsidized units to reduce tenant rent burdens to the current thirty percent of income standard. *See* Housing and Community Development Act of 1974, Pub. L. No. 93-383 §201, codified in 42 U.S.C. §1437f(c)-(d). Section 8 has two primary formats—project-based and tenant-based housing subsidies. Under the project-based program, HUD enters into long-term, usually twenty-year, subsidy contracts with owners for entire multi-family buildings.  The subsidy does not follow the tenant if the tenant moves out.  Rather, the project-based funding continues to subsidize the tenants for as long as they live in the property.  Importantly, the owner cannot evict or refuse to renew leases of the tenants except for a good cause reason related to tenant misconduct.  *See, e.g.,* 24 C.F.R. § 880.607 (2010).

The regular tenant-based voucher program, also called the Housing Choice Voucher program, is a different subsidy framework in which the subsidy is administered by the local housing authority and is provided on behalf of individual tenant families to their private landlords.  The tenant-based voucher program is governed by a different

subsection of the United States Housing Act and has a separate set of HUD regulations. 42 U.S.C. § 1437f(o) and 24 C.F.R. § 982 (2015). It is a much more flexible program, giving both the tenant and the landlord more choice, mobility, and options, while providing lesser tenant protections related to rent burden and security of tenure. In contrast to the longer-term commitments of the project-based program, the regular tenant-based voucher program, since 1996, permits the private landlord to terminate the lease of a tenant at-will at the end of a lease term and to evict the tenant, after the initial lease term, during the lease term for a broad set of good cause reasons, some of which are the landlord's business or personal reasons unrelated to tenant misconduct. 24 C.F.R. § 982.310.

Distinct from both the project-based subsidy and the tenant-based voucher subsidy is the relatively new and discrete world of Enhanced Vouchers. The Enhanced Voucher program was a specific protection that Congress created as a hybrid of the project-based and tenant-based programs. *Hayes*, 903 F.3d at 38. Beginning in the 1980s Congress faced the potential loss of thousands of properties subsidized under the project-based program when the building owners, after twenty years, could begin prepaying their loans to withdraw from the program and terminate its affordability restrictions. 24 C.F.R. § 221.524(a)(ii) (1970). These pre-payments, and later non-renewals of rental assistance contracts, threatened the involuntary displacement of hundreds of thousands of formerly subsidized tenants. Congress could have decided to provide the tenants living in these formerly subsidized buildings with individual, regular tenant-based vouchers. However, doing so would have led to the forced displacement of these tenants whose subsidy would likely have been insufficient to cover the rent in often gentrifying neighborhoods, and

who would no longer be protected by the definition of good cause based on tenant misconduct that they benefited from under their project-based subsidies.  Instead of providing these tenants with regular vouchers, Congress chose to create a distinctly new housing subsidy program – Enhanced Vouchers.

The Enhanced Voucher framework was deliberately crafted to prevent the forced displacement of subsidized housing tenants, such as the Hayes family.  Enhanced Vouchers protected the current tenants in the former project-based properties by ensuring that they could stay in their homes and extended their previous good cause protections to enable them to do so.  However these Enhanced Voucher protections only extended to tenants living in the building at the time of opt-out, so as tenants moved out, the building owner would regain the ability to rent those units on the private market and over time the whole building would become market-rate housing.  To protect the owner's financial interest, Enhanced Vouchers also ensured that owners would receive full market rent for these tenants.  In doing so, Congress created a strong anti-displacement right to continued occupancy that would enable tenants to stay in their homes, both at the termination of the project-based subsidy and continuing through future lease terms, absent good cause to evict.  *Hayes*, 903 F.3d at 40-45.

Congress's intent was to protect tenants in the specific set of circumstances presented in this case.  The plaintiffs in this action (hereinafter "the Hayes family") are a low-income tenant family who have lived in their home, 538B Pine Street, in the Society Hill neighborhood of Philadelphia since 1982 and have strong family ties to the area.  The defendant (hereinafter "Defendant Harvey") is the current owner of the property.  Defendant Harvey seeks to not renew the Hayes family's lease for reasons unrelated to

any tenant misconduct. This action would directly contradict the Enhanced Voucher Statute's Right to Remain that was specifically enacted to protect tenants, such as the Hayes family, who have put down roots in their neighborhoods, from forced displacement.

Prior generations of the Hayes family have lived in the Society Hill neighborhood, now a wealthy and exclusive neighborhood, for over eighty years. Compl. ¶ 24-28. In the 1970s the prior generations of the Hayes family were forced out of the neighborhood due to the elimination of the affordable housing they rented. *Id.* They spent the following decade fighting three cases in the Eastern District of Pennsylvania and the Third Circuit involving the Philadelphia Redevelopment Authority, the Society Hill Neighborhood Association and multiple neighbors so that they could eventually secure replacement affordable housing in their neighborhood. *Octavia Hill Association, Inc. v. Hayes*, Nos. 73-1599 (E.D. Pa. 1973); *Dodson v. Salvitti*, No. 74-1854 (E.D. Pa. 1977), *aff'd mem.* 571 F.2d 571 (3d Cir.), *cert. denied*, 439 U.S. 883 (1978); and *Society Hill Civic Ass'n v. Harris*, 632 F.2d 1045 (3d Cir. 1980). In 1982, pursuant to two consent decrees and judicial orders entered in the federal cases cited above, the Hayes family moved into 538B Pine Street, part of Washington Square East, a new housing development built and subsidized with federal project-based Section 8 subsidies under Section 8 of the United States Housing Act of 1937, 42 U.S.C. § 1437f.

In 2008 the owner of Washington Square East opted out of renewing the project-based Section 8 contract for the whole housing development. Exhibit F. As required by federal law, HUD provided the Philadelphia Housing Authority with the funding to issue tenant-based Section 8 Enhanced Vouchers ("Enhanced Vouchers") to the existing

tenants pursuant to 42 U.S.C. § 1437f(t). In August 2010 the Washington Square East owner sold part of the development, the property parcel 536-540 Pine Street, to Defendant Harvey, with the Hayes family and one other family already under voucher leases subsidized with Enhanced Vouchers.

This case began in early 2015 when the Hayes family's lease came due for renewal and Defendant Harvey took steps to not renew the lease. On February 17, 2015 Defendant Harvey sent the Hayes family a notice of non-renewal of lease and on May 1, 2015, sent a five-day eviction notice. Defendant Harvey articulated three reasons he did not want to renew the lease: (1) due to the death of the head-of-household, (2) a desire to renovate the unit and (3) a desire to move a family member into the Hayes family's unit.

The Third Circuit has ruled that owners must renew the leases of their Enhanced Voucher assisted tenants absent good cause to evict and has remanded the case to this Court to determine whether Defendant Harvey's three stated reasons constitute good cause under the Enhanced Voucher Statute. *Hayes*, 903 F.3d at 36, 48-49. The parties now file cross-motions for summary judgment. The Hayes family respectfully submit that Defendant Harvey's three stated reasons do not constitute good cause under the Enhanced Voucher Statute because none of the three stated reasons are related to tenant misconduct. The plain meaning of the Enhanced Voucher Statute is a strong Right to Remain that prevents the involuntary displacement of Enhanced Voucher-assisted families from their homes. This Right to Remain requires that good cause be defined as good cause related to tenant misconduct, as it was for these tenants previously as project-based tenants. The Right to Remain would be eviscerated if property owners could

6

choose to evict based on a broad definition of good cause beyond tenant-misconduct, as it is in the regular tenant-based voucher program.

## II.    STATEMENT OF UNDISPUTED FACTS

The Statement of Undisputed Facts is attached hereto as Exhibit A.

## III.    LEGAL STANDARD

The Federal Rules of Civil Procedure allow for summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  After appropriate discovery, the parties have agreed that there are no genuine issues as to any material facts and are therefore submitting cross motions for summary judgment at this time.

## IV.    ARGUMENT

### A.  Congress created Enhanced Vouchers with the Right to Remain to prevent involuntary displacement of tenants like the Hayes family.

The plain text of the Enhanced Voucher Statute protects tenants against involuntary displacement from the project by vesting the family with a Right to Remain for as long as the tenant elects to do so, and protects owners' financial interests by ensuring a subsidy based upon market rent.  The Enhanced Voucher Statute provides that when a project-based owner opts out of continuing with the project-based housing subsidy program:

the assisted family *may elect to remain in the same project* in which the family was residing on the date of the eligibility event[2] for the project, and if, during any period the family makes such an election and continues to so reside, the rent for the dwelling unit of the family in such project exceeds the applicable payment standard established pursuant to subsection (o) of this section for the unit, the amount of rental assistance provided on behalf of the family shall be determined using a payment standard that is equal to the rent for the dwelling unit.

42 U.S.C. § 1437f(t)(1)(B) (emphasis added).

As recognized by the Third Circuit Court, two essential and unique features give these vouchers an "enhanced" quality, distinct from the regular tenant-based voucher program, and enable the tenants to remain, if they so choose: (1) the decision of whether to remain in the project is the tenant's; and (2) if the tenant chooses to remain, HUD is required to subsidize the market rent for the property, which is often higher than the cap on the normal payment standard for regular voucher subsidies.  42 U.S.C. § 1437f(t)(1)(B) and *Hayes*, 903 F.3d at 41-42.  The Statute twice states that it is the tenant's choice to "elect to remain" and conditions HUD's higher subsidy payment on the duration of "any period the family *makes such an election* and continues to so reside." *Id*. (emphasis added).  In other words, a tenant has the Right to Remain in her home at the point of opt-out and to continue to remain in her home at the end of each lease term, absent good cause to evict her.  *Hayes*, 903 F.3d at 36.

Furthermore, emphasizing the importance of allowing the tenant the choice to remain in their community after an eligibility event, Congress extended the right

---

[2] The Enhanced Voucher Statute defines an "eligibility event" as the prepayment of the mortgage for a multifamily housing project, the voluntary termination of the insurance contract for the mortgage for the project or the termination or expiration of the contract for rental assistance or the transaction under which the project was preserved as affordable housing.  42 U.S.C. § 1437f(t)(2).

specifically to encompass "the project" as a whole and not just the particular unit. *Hayes*, 903 F.3d at 45 and n.6. This anti-displacement feature allows owners to move an Enhanced Voucher tenant within the project to any unit of appropriate size if their current unit becomes unavailable or inappropriate. *Id*. HUD's guidance has recognized that this Right to Remain includes internal project moves necessitated by changes in household size or composition, as well as the Right to Remain in a unit that is too large if appropriate size units are unavailable. HUD Notice PIH 2016-02 (March 4, 2016).

The Third Circuit's decision in this case found that the legislative history supported the plain meaning of the Statute's anti-displacement core through a Right to Remain. *Hayes*, 903 F.3d at 44. Over the latter part of the 1990s Congress took increasingly proactive steps to protect project-based tenants from involuntary displacement when the building owners exited the project-based subsidy program. Beginning in 1996 and renewing annually until 2000, Congress passed appropriations bills that both established tenant protections and provided funding for what became Enhanced Vouchers for these tenants. Congress provided these protection and funding for the express purpose of preventing "the involuntary displacement of low-income families, the elderly and the disabled because of the loss of affordable housing stock, expiration of subsidy contracts … or expiration of use restrictions . . ." Pub. L. No. 104-204, 110 Stat. 2884 (1996) ("Preserving Existing Housing Investment account"); Pub. L. No. 105-65, 111 Stat. 1344 (1997); Pub. L. No. 105-276, 112 Stat. 2660 (1998); Pub. L. No. 106-74, 113 Stat. 1047 (1999); Pub. L. No. 106-246, 114 Stat. 511 (2000). From the very beginning, these appropriations bills provided that any family receiving the assistance "*may elect to remain* in the unit and if the rent exceeded the payment standard,

the rent shall be deemed the applicable standard [if market-reasonable]." *Id*. (emphasis added).

In 1999 Congress formalized the protections for Enhanced Voucher-assisted tenants by enacting the unified Enhanced Voucher Statute as part of the United States Housing Act. Pub. L. No 106-74, § 538, 113 Stat. 1047, 1122-24 (1999) (codified as amended at § 1437f(t)). Rep. Rick Lazio, Chairman of the House Subcommittee on Housing and Community testified that "[i]n many circumstances, standard vouchers are inadequate in the face of market-rate rents, forcing residents to either find other shelter or remain in their homes and face the awful choice between paying rent or buying food and medicine . . . enhanced vouchers will allow particularly vulnerable populations the ability to remain in their own homes." *Section 8 Housing: Hearing Before the Sen. Subcomm. On Hous. and Transp*., 106th Cong. (1999); H.R. Rep. No. 106-379, pt. 2 at 9 (1999) (Conf. Rep.). The Enhanced Voucher Statute provides both the subsidy mechanism and the eviction protection necessary to ensure achievement of Congress's clear anti-displacement goal.

When Congress first enacted the Enhanced Voucher Statute in 1999 the original language stated that a tenant family was entitled to an Enhanced Voucher subsidy "during any period that the assisted family continues residing in the same project." Pub. L. No. 106-74, § 538, 113 Stat. 1047, 1122 (1999). Just a few months later in 2000, Congress took additional action to bring the Enhanced Voucher Statute in line with its prior legislation. Congress revised the language from stating "during any period that the assisted family continues residing in the same project …" to its current form to explicitly provide that "the assisted family *may elect to remain* in the same project." Pub. L. No.

106-74 § 538(a), 113 Stat. 1047, 1122 (1999) and Pub. L. No. 106-246, § 2801, 114 Stat.

511, 569 (2000) (emphasis added).  Congress thereby brought the Statute into conformity

with the consistent anti-displacement actions it had taken since 1996 to provide and fund

Enhanced Vouchers with a Right to Remain.  The House Conference Report indicates the

new language was proposed by both the House and Senate in order to clarify the intent of

the Enhanced Voucher Statute as an anti-displacement mechanism.  H.R. Rep. No. 106-

710 at 60, 164 (2000), as reprinted in 2000 U.S. C.C.A.N. 435, 482.  The Third Circuit's

decision highlights this Congressional amendment as proof that "Congress must have

given [Enhanced Voucher assisted] families some right that they did not enjoy

previously—a right to choose to stay that their landlords must accept by continually

renewing their leases." *Hayes*, 903 F.3d at 43.  The Enhanced Voucher assisted tenant's

Right to Remain necessarily includes the right not to be evicted for reasons unrelated to a

material breach of the lease or other tenant misconduct.

**B.  Good cause for terminating Enhanced Voucher tenancies must be related to tenant misconduct.**

In order for an Enhanced Voucher-assisted tenant to exercise her statutory Right

to Remain, any lease termination or non-renewal for good cause must be related to tenant

misconduct.  While the Third Circuit declined to rule on the definition of good cause in

the Enhanced Voucher context, its decision repeatedly emphasized that the Right to

Remain required that good cause serve to protect Enhanced Voucher tenants from forced

displacement.  The Third Circuit found that the plain meaning of the Enhanced Voucher

Statute "is unambiguous" and that the Right to Remain "necessarily limits the ability of

the owner of the property to evict.  If a landlord could simply ignore an eligible family's

choice to stay and force them to leave, the statutory right would be meaningless." *Hayes*,

903 F.3d at 45 and 42. While the Enhanced Voucher Statute states Enhanced Vouchers are generally subject to the regular tenant-based voucher program statute (42 U.S.C § 1437f(o)), they are modified by the Enhanced Voucher Statute in two keys ways—the tenants "may elect to remain" and the associated requirement of a higher subsidy based on market rent. 42 U.S.C § 1437f(t)(1). As recognized by the Third Circuit decision, it is these very modifications that give Enhanced Voucher tenants the Right to Remain in their buildings absent good cause to evict not just during the lease term, but also upon lease renewal. *Hayes*, 903 F.3d at 41. These two modifications therefore also require that the broader, regular tenant-based voucher definition of good cause and other good cause, be modified by the Right to Remain to exclude business and personal reasons.

This definition of good cause—as limited to tenant misconduct and not and owner's business or personal reasons—is the definition used in the vast majority of subsidized housing contexts, including the public housing and project-based subsidized housing programs. *See, e.g.*, 42 U.S.C.A. § 1437d(l)(5) and 24 CFR § 966.4(l)(2); 12 U.S.C.A. § 1715z-1b(b)(3); 24 C.F.R. § 247.2-.3; 24 C.F.R. § 880.607(b); HUD Handbook 4350.3, CHG-4 (Nov. 2013), para. 8-16 and App. 4-A (Model Lease for all HUD-subsidized programs), para. 23. In these contexts owners are required to have a good cause reason to terminate the lease of a tenant during the lease term and at the end of the lease term. Good cause is defined in these contexts exclusively based on tenant misconduct, such as material breach of the lease, criminal activity, or "other good cause." The definition of "other good cause" is still based on tenant misconduct, such as discovery after admissions of facts that made the tenant ineligible, failure to sign a new

12

lease, or other tenant-misconduct which the tenant is notified of in advance. *See, e.g.*, 24 C.F.R. § 247.3(b); 24 C.F.R § 880.504; 24 C.F.R § 983.257.

The only exception to (1) the requirement that an owner have good cause to evict both during and at the end of a lease term, and (2) the definition of good cause and other good cause as based exclusively on tenant-misconduct, is the regular tenant-based voucher program. Originally the regular tenant-based voucher program required that landlords have good cause both during the lease term and at the end of the lease term in order to evict. However, in the late 1990s Congress removed the good cause requirement at the end of the lease term for private landlords renting to regular tenant-based voucher tenants, allowing evictions of these tenants at-will at the end of the lease term. Pub. L. No. 105-276, § 545(a), 112 Stat. 2599 (1998) (enacting a revised § 8(o)(7)(C) of the U.S. Housing Act), now codified at 42 U.S.C. § 1437f(o)(7)(C). In doing so, Congress hoped to make the voucher program more in-line with the private rental market. *Id.*, *see also Estevez*, 2005 WL 3164146 at *6. Importantly, Congress took this action at the very same time that it was doing the opposite for prior project-based tenants threatened with displacement—creating the Enhanced Voucher framework and imbuing it with a strong Right to Remain. Secondly, it is only in the regular tenant-based voucher program that "other good cause" includes some tenant-misconduct based reasons as well as a "business or economic reason for termination of the tenancy (such as sale of the property, renovation of the unit, or desire to lease the unit at a higher rental)." 24 C.F.R. § 982.310(d)(1)(iv) (2007).

The Third Circuit decision recognized this distinction between the regulations for the project-based program, which define good cause as based on tenant-misconduct and

the regulations for the regular tenant-based program, which define good cause to include some "other good cause" reasons not based on tenant misconduct. *Hayes*, 903 F.3d at 48. The Third Circuit specifically noted that to date there is no regulation regarding the Enhanced Voucher program which would define good cause in this context. *Id*. The Third Circuit declined to reach a conclusion as to the scope of the definition of good cause and other good cause in the Enhanced Voucher context and rejected as inconclusive HUD's 2016 Enhanced Voucher proposed rule that specifically requested comment on the scope of good cause and other good cause. *Id*. *referencing* 81 Fed. Reg. at 74374-75. Three years after the proposed rule, HUD has issued no final rule; therefore the proposed rule is due no deference. *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019). HUD's amicus brief in the Third Circuit includes a footnote which asserts that the agency has already defined the grounds for eviction of Enhanced Voucher tenants in the tenant-based voucher regulations, 24 C.F.R. § 982.310, which include business and personal reasons. That is legally meritless, for at least two reasons. First, it contradicts the very terms of the proposed rulemaking that request comment on the issue, thus confirming that there is no currently applicable rule, only a proposal. *See Price v. Stevedoring Servs. of Am.*, 697 F.3d 820, 829-31 (9th Cir. 2012). Second, it ignores the plain text of the Enhanced Voucher Statute which provides tenants the Right to Remain in any unit *in the project,* as explained above.

Additional elements of the specific statutory text of the Enhanced Voucher Statute clearly tie the Right to Remain to the assisted family and the property and *not* to the business or personal desires of the owner. Beyond the "elect to remain" clause, the two exceptions to the Right to Remain specified by the Statute further reinforce that the Right

to Remain runs with the family's residence in the property and not with the owner.  The

Right to Remain terminates only when:"(i) the assisted family moves, at any time, from

such project; or (ii) the voucher is made available for use by any family other than the

original family on behalf of whom the voucher was provided."  42 U.S.C.

§ 1437f(t)(1)(C).  Had Congress contemplated termination of the Right to Remain by the

landlord's desire to end the tenancy for a reason unrelated to tenant misconduct, Congress

could have included such an event in its limited list of exceptions.  Statutes should be

read and understood according to their plain language. *McNeil v. United States*, 131 S.Ct.

2218, 2221 (2011); *United States v. Cooper*, 396 F.3d 308, 310 (3d Cir. 2005).  The plain

language of the Enhanced Voucher Statute references only changes in the assisted

family's place of residence or subsidy eligibility.

This interpretation of good cause and other good cause as based on tenant-

misconduct is further justified by the legislative history.  In addition to the Congressional

actions described above which created the Enhanced Voucher program, Congress took

another contemporaneous step to extend the same good cause protections which project-

based tenants had to Enhanced Voucher tenants.  In 1998 Congress amended the Tenant

Participation Statute to include Enhanced Voucher tenants, along with project-based

tenants, in its coverage and protections.  Pub. L. No. 105-276, § 105-276, § 599, 112 Stat.

2660 (1998), codified at 12 U.S.C. § 1715z-1b (tenants with Enhanced Vouchers must

have "leases approved by the Secretary [that] provide that tenants may not be evicted

without good cause . . .").  The Tenant Protection Statute conspicuously fails to extend its

protections to regular tenant-based voucher tenants. Logically, then, the definition of

good cause applicable to Enhanced Voucher tenants must not undermine the Right to

Remain by allowing private landlords to evict for business or personal reasons unrelated to tenant misconduct.  Congress's intent in creating the Enhanced Voucher program was to replicate the good cause stability afforded to project-based tenants.

The Third Circuit's analysis of the Right to Remain is in line with the unanimous decisions of all prior federal court cases regarding the Enhanced Voucher Statute.  *Hayes*, 903 F.3d at 47; *Park Village Apartments Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d 1150, 1156 (9th Cir. 2011); *Barrientos v. 1801-1825 Morton, LLC*, No. 06-6437, 2007 WL 7213974, *6, *aff'd on other grounds*, 583 F.3d 1197 (9th Cir. 2009); *Feemster v. BSA Ltd. P'ship*, 548 F.3d 1063, 1069 (D.C. Cir. 2008), *aff'g in relevant part*, 471 F. Supp. 2d 87 (D.D.C. 2007); *Estevez v. Cosmopolitan Assocs. LLC*, No. 05-4318, 2005 WL 3164146, *4-5 (E.D.N.Y. 2005) (specifically requiring owners to renew Enhanced Voucher leases absent good cause as it is "these additional benefits that set enhanced vouchers apart from other tenant-based voucher assistance."); *Jeanty v. Shore Terrace Realty Ass'n*, No. 03-8669, 2004 WL 1794496 at *3, 5 (S.D.N.Y. 2004) ("It is illogical to provide a tenant with the right to remain without requiring the landlord to offer the tenant the option to renew the lease.").

One of these cases specifically addresses the definition of good cause at the end of lease renewal.  In 2007, in *Barrientos*, the District Court for the Central District of California granted summary judgment and a permanent injunction to allow Enhanced Voucher assisted tenants to remain in their homes because the owners' attempt to evict them for a business or economic reason did not constitute sufficient good cause to terminate the families' Right to Remain.  *Barrientos*, 2007 WL 7213974 at *20.  The *Barrientos* court held that "given the clear right to remain established by [§ 1437f(t)],

16

Congress could not have intended that a recognized justification for the enhanced rent feature of enhanced vouchers—rent increases—would also constitute 'other good cause' to evict those same tenants." *Id*. at *9. The District Court therefore ruled that owners cannot evict Enhanced Voucher assisted tenants for other good cause for a business or economic reason, as they could if the tenants had a regular tenant-based voucher. The Ninth Circuit upheld the District Court's summary judgment and entry of the permanent injunction on other grounds (i.e., that the eviction was prohibited by local law, which was not preempted), though the Court stated that they agreed "that the eviction [based on a desire to raise the rent] violated the Enhanced Voucher Tenants' right to remain." *Barrientos v. 1801-1825 Morton LLC*, 583 F.3d 1197, 1207 (9th Cir. 2009). Thus, evictions based upon reasons other than tenant breach of lease or other misconduct are prohibited by the Enhanced Voucher Statute.

### C. The Hayes family have not breached their lease and therefore Defendant Harvey does not have good cause to evict them.

The Third Circuit remanded this case to the District Court so that it could consider whether Defendant Harvey had good cause for nonrenewal under the circumstances of this case. *Hayes*, 903 F.3d at 49. Beyond the legal sufficiency of the alleged grounds, a determination of whether good cause exists is a factual inquiry involving the good faith of the owner. *Id*. On February 17, 2015 Defendant Harvey sent a sixty-day non-renewal of lease notice and on May 1, 2015 Defendant Harvey sent a five-day eviction notice to the Hayes family seeking to evict them from their home by April 30, 2015. Exhibits K and L. These notices allege that Defendant Harvey sought to evict the Hayes family (1) due to the death of Mrs. Florence Hayes, the head of household on the Enhanced Voucher, (2) Defendant Harvey's desire to renovate the unit and (3) due to wanting to

17

move a family member into this specific unit.  Exhibits K and L.  None of these reasons constitute sufficient good cause to evict the Hayes family from the whole project, under the Enhanced Voucher Statute, as Defendant Harvey did not allege tenant misconduct. Rather, as Defendant Harvey and his daughter and property manager, Allison Hindman-Harvey, both stated, the Hayes family were very good tenants who pay their rent on time, do not cause disturbances and have never had neighbors complain about them.  Exhibit D 36:7-20, 41:19-24 and Exhibit E 16: 9-17 and 17:1-12.  Based on this alone, Defendant Harvey does not have good cause to evict or fail to renew the Hayes family's lease.

Beyond that, Harvey's stated reasons are legally insufficient. The death of the head of household on the lease did not affect the Hayes family's Right to Remain with their Enhanced Voucher.  The Enhanced Voucher Statute provides that the Right to Remain does not pass from the original assisted family to another if the original assisted family were to move out.  42 U.S.C. § 1437f(t)(1)(C).  However in this instance, the assisted family remained the same, the only change was that the head of household, Mrs. Florence Hayes, passed away.  Exhibit C 10:21-11:12.  Her son, former Plaintiff Theodore Hayes was on the lease since long before the Enhanced Voucher was issued to the Hayes family in 2010 and the Philadelphia Housing Authority processed him as the new head of household upon the death of Mrs. Florence Hayes.  Exhibit B 9:1-23 and 12:23-13:19, Exhibit J, and Exhibit G ¶ 9.  Furthermore, Mrs. Florence Hayes's granddaughter, Plaintiff Aqeela Fogle, and her three children have also all been on the lease since before the Enhanced Voucher was issued to the Hayes Family in 2010. Exhibit C 8:5-8 and 8:20-9:7.  When former Plaintiff Theodore Hayes moved out of the unit in May 2017, the Philadelphia Housing Authority processed Plaintiff Aqeela Fogle

18

as head of household.  Exhibit S and T.  Therefore, the assisted family, at the time Defendant Harvey sent the lease termination notices, was the original family that was granted an Enhanced Voucher in 2010 and their Right to Remain was not affected by the death of the former head of household.

Defendant Harvey's remaining two stated business and personal reasons still would not constitute good cause, even if a broader definition of other good cause beyond tenant misconduct were permissible.  Defendant Harvey's desire to renovate the unit does not provide sufficient grounds to terminate the Hayes family's Right to Remain in the project with their Enhanced Voucher.  The project is a singly deeded series of three duplex row homes at 536-540 Pine Street.  Exhibit H.  Each of the three duplexes has a one-bedroom apartment on the first floor and a three or four-bedroom apartment upstairs. The Hayes family live in the upstairs unit of the middle duplex, which is a four-bedroom unit.  The other Enhanced Voucher-assisted tenant is an elderly tenant who lives alone in a one-bedroom apartment on the first floor of the neighboring duplex.  In addition to the two Enhanced Voucher assisted families, Defendant Harvey rents the remaining four units—two three- and four-bedroom upstairs units and two one-bedroom downstairs units—to tenants on the private market.

As in the project-based context, landlords can complete renovations with the tenants in place, or, if necessary, tenants can stay elsewhere temporarily during repairs, or repairs can be scheduled when other units at the property become available.  Landlords often make repairs or renovate their units for a variety of reasons: repairs are necessary to address code violations or serious systems' repairs, the tenants request the renovations or repairs, or the landlord hopes to rent the unit for a higher amount.  It can only be assumed

that Defendant Harvey's desire to renovate the unit, since the renovations were not requested by the tenants, stems from his wish to rent the unit for more than the $2,400 monthly contract rent he received from 2010 through 2019 when the contract rent was increased to $3,400 a month.  Exhibit D 50:14-22, 48:12-49:22, Exhibit B 114:3-13, Exhibit U and V.  Defendant Harvey has renovated four of the other units in the property parcel (536A and B were in the process of being renovated when Defendant Harvey purchased the property and, 538A and 540B Pine Street were renovated by Defendant Harvey after he purchased them) and rented them to private tenants at higher rents to reflect the new amenities, appliances, flooring and walls.  Exhibit D 53:15-19 and Exhibit E 17:16-23:9.  If Defendant Harvey wants to renovate the Hayes family's unit, he has options that allow him to do so without having to evict the Hayes family from the project. The Hayes family, could either remain in their unit while renovations are being completed, or, if necessary, could stay elsewhere temporarily, or they could be relocated into one of the other appropriately-sized units which have been repeatedly available during the pendency of this case.  Exhibit D 53:15-54:19, 57:6-24, 64:23-65:11and 67:5-19, Exhibit E 18:23-19:12, 19:10-12, 19:18-20:3, 21:6-22:3 and 22:13-23:6 and Exhibit N, O and P.

Since Defendant Harvey is statutorily guaranteed a reasonable rent, if he chooses to do the renovations, he will receive a higher rent comparable to the market rent he charges for his other renovated units.  42 U.S.C. § 1437f(t)(1)(B).  As it is, even without doing any renovations, the Philadelphia Housing Authority agreed to Defendant Harvey's request for a rent increase in 2019 and increased the monthly contract rent to $3,400. Exhibit U and V.  Therefore, Defendant Harvey's business or economic reason to

renovate the unit did not terminate the Hayes family's Right to Remain in the project as a whole. *See Barrientos,* 2007 WL 7213974 at *9; *Barrientos*, 583 F.3d at 1214-15.

Defendant Harvey's third stated reason, that he allegedly needs to move a family member into that specific unit, also does not terminate the Hayes family's Right to Remain in the project as a whole. Defendant Harvey stated that he needs to evict the Hayes family because he would be moving his daughter, her husband and their young child into this specific unit. Mem. of Law in Support of Def. Harvey's Opp. to Pl.'s Mot. for Prel. Inj., Docket No. 9, page 14-15, Exhibit D 42:23-43:3 and 58:4-12. In Defendant Harvey and Elizabeth Hindman-Harvey's depositions, it was explained that Elizabeth Hindman-Harvey lived at a nearby property of her father's and that the reasons for her desired move are: (1) her father's business partner no longer wished to rent Elizabeth Hindman-Harvey's unit to her rent free and so she needed to move into a different unit of her father's that he did not co-own with the business partner, (2) she desired a quieter neighborhood, (3) she needed a four-bedroom so that both she and her husband could each have a home office, and (4) she would like to have a bedroom on the same floor as her infant daughter. Exhibit M 8:16-24 and 9:1-2. Elizabeth Hindman-Harvey stated that she began having conversations with her father regarding moving into the property parcel at 536-540 Pine Street early in 2015, but had not visited the property as a prospective tenant and was not aware that there were other units in the property or that there were multiple units available. Exhibit M 8:3-11, 10:17-11:6. She did not express a preference for a particular unit or even for being housed at that particular property parcel since she was depending on her father's generosity in continuing to house her rent free. Exhibit M 13:12-14 and 15:8-10.

21

Defendant Harvey's family reason for wanting to evict the Hays family is suspect. There are two other units on either side of the Hayes family's unit, in the same project— 536B and 540B Pine Street—that are the exact same size as 538B Pine Street, and have equivalent advantages, which would have been options to move his daughter into, or to relocate the Hayes family into, at multiple points throughout this litigation. Exhibit D 53:15-54:19, 57:6-24, 64:23-65:11and 67:5-19, Exhibit E 18:23-19:12, 19:10-12, 19:18-20:3, 21:6-22:3 and 22:13-23:6 and Exhibit N, O and P.

If Defendant Harvey needed to move his daughter into the project, he had options to do so without evicting the Hayes family from the project as a whole. During the time period that Defendant Harvey sent the two eviction notices to the Hayes family, and for another month after the initial filing of this case in May 2015, the two identically-sized units on either side of the Hayes family's unit were under renovations and available for rent. On the right, 540B Pine Street was vacant and under renovation from approximately February 2015 through June 2015. On the left, 536B Pine Street was vacant, had already been renovated, and was available for rent from approximately May through mid-July 2015. Exhibit D 57:6-24 and 67:5-19, Exhibit E 21:6-22:3 and 22:13-23:6, and Exhibit N and O. During this six month period, rather than move his daughter or relocate the Hayes family into either of these available units, Defendant Harvey instead sent two eviction notices to the Hayes family and refused to rescind them such that the Hayes family filed a complaint and motion for preliminary injunction, to which Defendant Harvey filed an answer. Exhibits K and L, and Docket Nos. 2, 4, and 7. A year later in the spring of 2016, the corner unit to the right, 540B Pine Street was again listed for rent from approximately April 4, 2016 until at least May 23, 2016. Exhibit P.

During this same month, Defendant Harvey learned that judgment had been entered in his favor in this case. Yet again, despite the available, already-renovated, identically-sized unit next door that Defendant Harvey could have used for his daughter or the Hayes family, Defendant Harvey instead chose to file in Philadelphia's Municipal Court to evict the Hayes family from the project as a whole.

Either 536B or 540B Pine Street, at multiple points throughout this litigation, or one of the other many properties owned by Defendant Harvey, were options for Defendant Harvey to move his daughter and her family into without the need to evict the Hayes family. Defendant Harvey owned just under 50 rental properties, almost all of which were in the desirable Center City area of Philadelphia. Exhibit D 9:3-13 and 53:19-22. In plaintiffs' depositions of Defendant Harvey, his daughter Allison Hindman-Harvey, the property manager for the property parcel, and his daughter Elizabeth Hindman-Harvey, the proposed future inhabitant of 538B Pine Street, all three members of the family were asked why Elizabeth Hindman-Harvey could not move into 536B or 540B Pine Street and all three failed to give a reasonable answer. Exhibit D 58:4-15, Exhibit E 37:13-20, and Exhibit M 15:8-10.

Based on Defendant Harvey's statements made in his deposition, Defendant Harvey believed that he had "the right to do with that place as I wish" and believed that this action was a "game" to try to interfere with his "ownership of my privately-owned property." Exhibit D 45:12-13, 62:5-6, and 58:23-24. Defendant Harvey did not believe that there were any differences between the rights and protections afforded a private tenant and those afforded to Section 8 voucher tenants, much less Enhanced Voucher

23

assisted tenants. Exhibit D 38:6-7. Defendant Harvey did not believe he had to have

good cause to evict the Hayes family and summarized his position by stating:

> I don't think it has nothing to do with my daughter. I think it has to do
> with my right to be able to take that property and renovate it and be able to
> use it as I please … I don't think I have to have good cause. I mean, that's
> your language. That's your stipulations. That's the reason we're having
> this confrontation. You have your game to play, and I am not entering
> into that game. Exhibit D 61:14-18 and 62:2-6.

Therefore, Defendant Harvey's alleged desire to renovate or move his daughter

into the Hayes family's unit as opposed to one of the other comparable units is contrived

and not sufficient good cause to terminate the Hayes family's Right to Remain in the

project as a whole.

## IV.    CONCLUSION

The Enhanced Voucher Statute is a specific fix to a finite problem. It protects

Enhanced Voucher assisted families from arbitrary displacement while allowing property

owners, such as Defendant Harvey, to continue to use their properties as private rental

investment properties and receive market rents. All Congress is requiring Defendant

Harvey to do, is to keep good tenants, such as the Hayes family, in the property, with

guaranteed full market rent. Defendant Harvey has options to renovate or move his

daughter into the project. Any upgrades which Defendant Harvey makes to the property

will be matched by an increase in market rent. If Defendant Harvey needs to move the

Hayes family into another appropriate unit in the project, he can do so. If the Hayes

family cease being good tenants—if they stop paying their rent on time or start causing

disturbances—or if they choose to move out of the unit, then the unit will revert back to

the private market. At that point there will be no more subsidy tied to the unit. This has

already happened in four out of the six units in this particular project.

24

The Enhanced Voucher program is a specific program intended to address the exact scenario in this case.  Congress enacted a moderate balance between tenants' rights and the individual property rights of owners.  *Hayes*, 903 F.3d at 44.  The Enhanced Voucher Statute provides for fair compensation for the property owners and a path for these owners to remove their properties from a subsidy program.  Congress's carefully moderated balance must be enforced.  The Third Circuit held that Congress created the Enhanced Voucher Statute to give tenants living in formerly project-based buildings the Right to Remain in the project absent good cause to evict them.  In creating the Enhanced Voucher program, Congress replicated project-based stability for these tenants. Enhanced Voucher assisted tenants should be protected by the same definition of good cause—based on tenant-misconduct—that they received under the project-based program.  On the basis of this record, there is no good cause to evict the Hayes family.

WHEREFORE, Plaintiff prays this Court:

1. Grant plaintiff's motion for summary judgment;

2. Award reasonable attorney fees to the extent permitted by law; and

3. Grant all other relief to which the Plaintiff is entitled.

Dated:  November 27, 2019                    Respectfully submitted,

*/s/ Rachel Garland*
Rachel Garland
George Gould
COMMUNITY LEGAL SERVICES, Inc.
1424 Chestnut Street
Philadelphia, PA 19102
Telephone: 215-981-3778
rgarland@clsphila.org
*Attorneys for the Plaintiff*

25